Alfredo ESTEBAN, by his mother and next friend, Guadaloupe P. Esteban, and Steve Craig Roberds, by his father and next friend, James Roberds, Plaintiffs,

v.

CENTRAL MISSOURI STATE COLLEGE, Warrensburg, Missouri, Warren C. Lovinger, President of Central Missouri State College, Warrensburg, Missouri, and W. Lester Simpson, President and Joe Herndon, Leland J. Culp, Virginia Gottlieb, Byron Constance, and J. N. Cunningham, members of the Board of Regents of Central Missouri State College, Warrensburg, Missouri, Defendants.

No. 16852–4.

United States District Court
W. D. Missouri, W. D.

Sept. 25, 1968.

**624**

Irving Achtenberg, Kansas City, Mo., for plaintiffs.

Robert L. Wesner, Sedalia, Mo., for defendants.

## OPINION

ELMO B. HUNTER, District Judge.

Plaintiffs were students at Central Missouri State College, Warrensburg, Missouri, until March 31, 1967, when by order of defendant Warren C. Lovinger, president of the college, they were suspended for two semesters, with the right thereafter to apply for readmission. Plaintiffs filed a complaint in this Court charging, among other things, that they had been suspended without proper notice and hearing and in violation of their constitutional right to procedural and substantive due process. After a trial on September 6–7, 1967, this Court directed that they be given a new hearing. For the details, see Esteban v. Central Missouri State College, 277 F.Supp. 649.

Pursuant to the Court's direction, on October 18, 1967, written charges and notice of hearing were served on plaintiffs by the college. The new hearing occurred on November 3, 1967, with the result that the previous suspensions were reaffirmed. Plaintiffs then filed their present complaint.[1]

Plaintiffs claim the reaffirmed suspensions are tantamount to expulsion and are invalid because:

(1) The college regulation with regard to mass gatherings violates the first amendment guarantee of freedom of speech and assembly.

(2) The college regulation with regard to participating in mass demonstrations violates the first and fifth amendments in that its language is vague, uncertain and overbroad, providing plaintiffs with no reasonable standard for observance and no notice of illegal conduct.

(3) The enforcement of the mentioned regulation as to off campus conduct is beyond the powers of the college and is a denial of due process.

(4) The charge as originally made did not contain the words "contributing to" which quoted language is not a part of the regulation and hence is unenforceable.

(5) The hearing before Dr. Lovinger lacked procedural due process as required by the fourteenth amendment

---

1. Plaintiffs invoke jurisdiction under the first and fourteen amendments, United States Constitution, Title 28, U.S.C. §§ 1331 and 1343, and Title 42, U.S.C. §§ 1981 and 1983 (Civil Rights).

in that there was no evidence to support a charge of participating in an unruly or unlawful mass demonstration.

Plaintiffs request this Court to declare the college regulation to be void; to enjoin its enforcement; to set aside this suspension; to expunge all mention of their suspension from their college record; and to permit them to reenter the college in good standing.

Defendants strongly deny all plaintiffs' claims. Defendants plead res judicata and mootness, citing the earlier decision which was not appealed, and noting that the condition of the suspension was that plaintiffs were not eligible to reapply for two semesters which have now passed. Defendants also assert this Court should abstain from all action herein until and unless there is a full exhaustion of state court remedies by plaintiffs.

On August 16, 1968, the case was fully tried to the Court on the issues presented. Discussion and disposition of mentioned issues and the varying contentions of the parties are necessary.

*November 3, 1968 College Hearing:*

A summary of the substance of the evidence presented to Dr. Lovinger in the November 3, 1967 hearing is desirable prior to discussing the issues. The charges related to Mr. Esteban's and Mr.

Roberd's activities in connection, with mass student demonstrations occurring the evenings of March 29, and March 30, 1967.[2] These demonstrations took place at the intersection of the public street adjacent to the school campus and State Highway 13 and overflowed onto the sidewalks and campus.[3] On the evening of March 29, some 350 students were present in the mass and on March 30, there were some 600 students included. As a partial result of these two mass demonstrations there was in excess of $600 damages and destruction of college property, including broken school building windows and destroyed shrubbery; eggs were thrown; the Dean of Men, Dr. Chalquist, was hanged in effigy, his "dummy" torn up and set on fire; traffic was halted and blocked, cars were rocked, and their occupants ordered out into the street. The college president directed a number of his personnel, including Dr. Meverden, to go to the scene to restore order.

ESTEBAN EVENT:

Introduced at the November 3rd, 1967 hearing was Mr. Esteban's testimony to the following effect: He was on scholastic probation and only a short time previously had been terminated from disciplinary probation over a knife cutting incident with a fellow student. The evening of March 29, 1967, around 11:30

---

2. The written charge against Esteban read: "You are hereby notified that you are charged with contributing to and participating in an unruly and unlawful mass gathering occurring on the 30th day of March, 1967, at and near Central Missouri State College in that you, the said Alfredo Esteban, did resist efforts of one Dr. M. L. Meverden in dispersing said mass gathering, failed and refused to identify yourself to Dr. Meverden as requested and used vile and obscene language towards and threatened a resident assistant of the College at Foster-Knox Hall."

The written charge against Roberds read: "You are hereby notified that you are charged with contributing to and participating in an unruly and unlawful mass gathering occurring on or about the 29th and 30th days of March, 1967 at and near Central Missouri State College in that you, the said Stephen Craig Roberds,

on the 5th day of February, 1967 directed correspondence to Mr. E. J. Cantrell of the Missouri Legislature evidencing your intention to participate in such mass gathering, did thereafter advise Dean Hollis Chalquist, Dean of Men, of your intention to participate in such demonstration at which time you were specifically advised that such participation would result in immediate suspension from Central Missouri State College and that you did thereafter continue to contribute to and participate in said mass gathering all of which actions were in violation of the terms and provisions of your disciplinary probation."

3. Dr. Lovinger termed them "a riot which blocked traffic on a state highway which caused considerable damage on the campus which had the citizens of Warrensburg very much worried with all the noise and turmoil that was caused."

p. m., he left his dormitory about the time the "disturbance" had subsided. Some of the students were proceeding along the street from the mass demonstration to their dormitories. Esteban proceeded down the sidewalk to within about 100 feet of the intersection of the scene of the mass demonstration and stayed there awhile. Dr. Meverden, a faculty member, who was seeking to disperse students standing outside their dorms, approached Esteban and asked him to go inside the dormitory. Instead of complying, Esteban asked why, and on again being requested to go in, again asked why. He told Dr. Meverden that he was not in violation of any state, county, or federal law and that he had a right to be out there. Dr. Meverden asked for his student identification card which by college regulation he was required to have in his possession at all times. Esteban said ("in rough words" according to one witness) he did not have it. Nor did he give his name. Dr. Meverden again requested him to go in the dormitory and get off the street. Esteban argued with Dr. Meverden and questioned his authority, saying there were no rules limiting the time men could stay outside the dorms. Shortly, and with the encouragement of other students present, he went into the dormitory. Dr. Meverden also went in and asked Gerald Haddock, the resident assistant of Esteban's dormitory, who Esteban was. Haddock was overheard by Esteban telling Dr. Meverden Esteban's name. Esteban, as Dr. Meverden was leaving, called Haddock a prick and a bastard and told him he "would not be around here very long." According to Esteban's roommate, Esteban then angrily picked up a waste can and emptied the contents on the floor at the feet of Haddock.

ROBERDS EVENT:

Prior to the mass demonstrations, Roberds had been placed on disciplinary probation and furnished a written statement of the terms of that probation. Dean Chalquist also orally explained those terms to him. He and Dean Chalquist conversed relative to his intention to participate in a demonstration.[4] Roberds asked about the possible repercussions of his involvement in (future) demonstrations or disturbances. He was advised "that any action on your part which may reflect unfavorably upon either you or the institution can be considered grounds for suspension."[5] Ro-

---

4. The pertinent college regulations mainly involved read: "The conduct of the individual student is an important indication of character and future usefulness in life. It is therefore important that each student maintain the highest standards of integrity, honesty and morality. All students are expected to conform to ordinary and accepted social customs and to conduct themselves at all times and in all places in a manner befitting a student of Central Missouri State College.

"All students that enroll at C.M.S.C. assume an obligation to abide by the rules and regulations of the college as well as all local, state and federal laws.

"When a breach of regulations involves a mixed group, ALL MEMBERS ARE HELD EQUALLY RESPONSIBLE.

"Conduct unbefitting a student which reflects adversely upon himself or the institution will result in disciplinary action."

"Mass Gatherings—Participation in mass gatherings which might be considered as unruly or unlawful will sub-

ject a student to possible immediate dismissal from the College. Only a few students intentionally get involved in mob misconduct, but many so-called 'spectators' get drawn into a fracas and by their very presence contribute to the dimensions of the problems. It should be understood that the College considers no student to be immune from due process of law enforcement when he is in violation as an individual or as a member of a crowd."

5. Dr. Chalquist testified:

"A question was raised concerning what action might be taken against him if he were to become involved in a disturbance or demonstration.

Mr. Wesner: And how did that come about? Who brought that up?

Dr. Chalquist: Mr. Roberds brought that question up.

Mr. Wesner: And did you, as Dean of Men, advise Mr. Roberds what action

berds, under date of February 5, 1967, wrote E. J. Cantrell, a Representative from his county in the Missouri Legislature, the following letter:

" * * * I assure you, I do not stand alone in my disgust with this institution. From suppression of speech and expression to ridiculous, trivial regulations this college has done more to discourage democratic belief than any of the world's tyrants. * * * My comrades and I plan on turning this school into a Berkeley if something isn't done."

Throughout both evenings of the mass demonstrations Roberds was present as a part of the crowd. On March 29, 1967, he arrived at the scene of the demonstration about 10:15 p. m. and returned to his dormitory about 10:45 p. m. On March 30, 1967, he arrived at the scene about 9:30 p. m. and remained until about 10:30 p. m. During the first night, while a part of the gathered crowd, he talked to students who were present in it. Roberds testified that the second evening, also while a part of the crowd at the demonstration, that "I discussed some of the things that were going on, the rocking of the cars and the dummy. At that time I mentioned my disgust with the college, and we talked, as the people I had talked to had the same feeling." He saw the dummy brought to the scene of the demonstration; saw it hung, torn up and burned by students in the crowd. He saw the cars approached by the students, saw the cars rocked, saw the attempts to take the occupants out of the cars. He returned to his dormitory after the dispersal of the gathering. He stated he

was at the demonstrations each evening simply as a "spectator", not participating in any of the acts of violence or destruction.

Prior to directly disposing of the various issues and contentions it is helpful to set out certain pertinent fundamentals that may be generally involved.

*Question of Jurisdiction:*

Under Sections 1343(3), Title 28, and 1983, Title 42, U.S.C., and also in appropriate cases under Sections 2201 and 1331(a), Title 28, U.S.C., United States District Courts have jurisdiction to entertain and determine actions by students who claim unreasonably discriminatory, arbitrary or capricious actions lacking in due process and depriving a student of admission to or continued attendance at tax supported institutions of higher learning. The instant case was brought specifically as a Section 1983 case in equity and the Court has jurisdiction.

*Question of Exhaustion of Remedies:*

■ Counsel for defendants strongly urges that federal courts may not and should not proceed in this kind of case until all state remedies have been first exhausted. However, it is the law that in an action in equity or law under Section 1983, Title 42, U.S.C. the doctrine of exhaustion of state judicial remedies is not applicable. The fact that there is an existing state judicial remedy for the alleged wrong is normally no ground for stay or dismissal. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967), McNeese v. Board of Education, etc., 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

would or might be taken in the event he might become involved.

Dr. Chalquist: I did.

Mr. Wesner: Did Mr. Roberds specifically state to you that he intended to participate in a demonstration?

Dr. Chalquist: No, he did not. He did not say that he intended to do so.

Mr. Wesner: As I understand you, he merely asked you what action would be taken against him if he did so, is that right?

Dr. Chalquist: Yes, sir.

Mr. Wesner: And what action did you tell him would be taken?

Dr. Chalquist: I told him that according to the terms and conditions under which he had been placed on disciplinary probation, that his continued existence or association with the College would be in jeopardy. In other words, there was a possibility that he could be suspended for such involvement."

*Question of Exhaustion of Institutional Processes:*

■ Ordinarily until the currently available institutional processes have been exhausted, the disciplinary action is not final and the controversy is not ripe for determination. Under the facts presented in the instant case it is apparent that there has been an exhaustion of available institutional processes.

*Question of Mootness:*

■ In an action at law or equity under Section 1983, Title 42, U.S.C. to review severe disciplinary action, such as the instant case involving lengthy suspension and a concomitant adverse school record with continuing adverse effect on the student involved, the doctrine of mootness is not applicable when the action is timely filed. Cf. Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), overruling Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L. Ed.2d 963 (1960), and Sibron v. State of New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), qualifying St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943).

*Question of Res Judicata:*

■ The earlier Esteban case ordered that plaintiffs be given written charges, a new notice and a hearing. Plaintiffs' present contentions concern matters neither presented, decided by, nor necessary to that decision. They are not barred by the doctrine of res judicata. See, 30A Am.Jur. Judgments, Section 374 and cases there cited.

*Question of Scope of Section 1983:*

■ In an action under Section 1983, the issues to be determined will be limited to the determination of whether, under color of any statute, ordinance, regulation, custom or usage of a state (i. e. "state action") a student has been deprived of any rights, privileges or immunities (of which he complains) secured by the Constitution and laws of the United States.

*Question of "State Action":*

■ Disciplinary action by any institution, institutional agency, or office ordinarily will be deemed to be under color of a statute, ordinance, regulation, custom or usage of a state—i. e. "state action" within the meaning of Section 1983, Title 42, U.S.C. The action of the college in suspending plaintiffs herein and its actions used to accomplish that suspension, are state actions within the meaning of Section 1983, Title 42, U.S.C.

*Question of Whether Educational Institutions Can Proscribe Only Student Conduct That is Illegal and Impose Only Procedures That Comport With Criminal Law:*

Plaintiffs contend the written regulations on which the college relied in their challenged suspensions are void as being beyond the powers of the college to prohibit because they are so broad as to cover conduct that is not illegal, i. e. not in violation of a federal or state law or municipal ordinance.

■ The discipline of students in the educational community is, in all but the case of irrevocable expulsion, a part of the teaching process. In the case of irrevocable expulsion for misconduct, the process is not punitive or deterrent in the criminal law sense, but the process is rather the determination that the student is unqualified to continue as a member of the educational community. Even then, the disciplinary process is not equivalent to the criminal law processes of federal or state criminal law. For, while the expelled student may suffer damaging effects, sometimes irreparable, to his educational, social, and economic future, he or she may not be imprisoned, fined, disenfranchised, or subjected to probationary supervision. The attempted analogy of student discipline to criminal proceedings against adults and juveniles is not sound. Such cited cases as In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967), Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), and Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) are not applicable.

■ In the lesser disciplinary procedures, including but not limited to guidance counseling, reprimand, suspension of social or academic privileges, probation, restriction to campus and dismissal with leave to apply for readmission, the lawful aim of discipline may be teaching in performance of a lawful mission of the institution. The nature and procedures of the disciplinary process in such cases should not be required to conform to federal processes of criminal law, which are far from perfect, and designed for circumstances and ends unrelated to the academic community. By judicial mandate to impose upon the academic community in student discipline the intricate, time consuming, sophisticated procedures, rules and safeguards of criminal law would frustrate the teaching process and render the institutional control impotent. This Court will not make such imposition.

*Relevancy of Standards of Student Conduct to a Lawful Mission of the Educational Institution:*

■ The standard of conduct which the educational institution seeks to impose on a student must be one that is relevant to a lawful mission, process or function of the educational institution. It is not a lawful mission, process or function of an educational institution to prohibit the exercise of a right guaranteed by the Constitution or by a law of the United States to a member of the academic community. Such prohibitions are not reasonably relevant to any lawful mission, process or function of the educational institution. Each case must be considered on its own particular facts to determine whether or not the standard of required student conduct involved possesses the necessary relevance.

■ It is relevant to the lawful mission of a college or other institution of higher education to prohibit participation in mass gatherings that are unruly or unlawful. Plaintiffs tacitly concede that unlawful demonstrations may be pro-

hibited by college authorities but do not concede "unruly" ones may also be proscribed.

■ Webster's Third New International Dictionary, unabridged defines unruly as "not readily ruled, disciplined or managed: turbulent, uncontrollable." "Turbulent" is defined as "disposed or given to insubordination or disorder: causing great unrest: inciting violence or disturbance." Certainly, as reasonably interpreted and applied by the college such a prohibition as is contained in the challenged regulation is not a prohibition of a student demonstration that is peaceful in nature, according lawful respect for the rights and property of others. There is no indication the college is endeavoring to deprive these plaintiffs, or any of its students, of their constitutional rights of free speech, of peaceable assembly or of right to petition for redress of grievances; nor to "chill" any endeavor on their part to lawfully exercise such rights. See, Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 and West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. Certainly the regulation concerning mass demonstrations, reasonably interpreted, and as interpreted and applied by the college in the instant case to a participant in student mass demonstrations involving unlawful conduct such as the illegal blocking of a public highway and street, and the destruction of school property, is relevant to a lawful mission of the educational institution.[6] Neither the first amendment nor any other provision of the Constitution prohibits an educational institution from protecting itself against conduct that would damage or destroy it or its property in toto or in part.

*Question of Whether the College Regulations Are Overly Broad and Too Vague to be the Basis of Disciplinary Action:*

Plaintiffs contend the regulations under which the college acted are too vague

6. See General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133, for a listing of numerous lawful missions of educational institutions.

and indefinite to be enforceable, relying on the criminal law and on criminal and juvenile cases concerning the "void for vagueness doctrine".

 The legal doctrine that a prohibitory *statute* is void if it is overly broad or unconstitutionally broad does not, in the absence of exceptional circumstances, apply to standards of student conduct.[7]

Judicial notice is taken that outstanding educational authorities in the field of higher education believe, on the basis of experience, that detailed codes of prohibited student conduct are provocative and should not be employed in higher education. See, Brady and Snoxell, Student Personnel Work in Higher Education, p. 378 (Houghton-Mifflin, Boston, 1961). For this reason, general affirmative statements of what is expected of a student may be preferable in higher education. Such affirmative statements should, of course, be reasonably construed and applied in individual cases.

 An institution may establish appropriate standards of conduct (scholastic and behavioral) in any form and manner reasonably calculated to give adequate notice of the scholastic attainments and behavior expected of the student.

The notice of the scholastic and behavioral standards to the students may be written or oral, or partly written and partly oral, but preferably written. The standards may be positive or negative in form.

Standards so established may apply to student behavior on and off the campus when relevant to any lawful mission, process, or function of the institution. By such standards of student conduct the institution may prohibit any action or omission which impairs, interferes with, or obstructs the missions, processes and functions of the institution.

Standards so established may require scholastic attainments higher than the average of the population and may require superior ethical and moral behavior. In establishing standards of behavior, the institution is not limited to the standards or the forms of criminal law.

 If the student knows or as a reasonable person should know that the action or conduct he is about to undertake is violative of the regulation or standard of conduct and he intentionally engages in such conduct, he is in no position to invoke the aid of judicial equity powers involving equitable doctrines to enjoin resultant disciplinary action. In the instant case both Esteban and Roberds were put on notice both by the regulations in question (and by plain common sense)[8] that their conduct was violative of the pertinent college standards contained therein and could result in severe disciplinary action. Esteban had knowledge of the college regulation that was reasonably calculated to give him notice he could not use vile language on and physically threaten authorized college personnel who in the course of their normal duties upon proper request reported his name to a faculty member. Roberds likewise should have known he could not be an active participant in a large student demonstration involving both illegal and destructive conduct.

*Question of Roberds Being a "Mere" Spectator:*

 Roberds strongly urges there is no evidence that he was other than a mere spectator rather than a participant in the two demonstrations. One requirement of constitutional due process in student disciplinary proceedings is that

---

7. Statutes are enacted by federal or state legislatures and not by educational institutions for student disciplinary purposes as such. Hence, different considerations are involved.

8. Is a published (oral or written) standard necessary to advise a student he cannot cheat on exams, keep other students out of their classroom, strike a professor, talk loudly in class during the recitation of others, come to class in a bathing suit, curse his professor in the classroom, engage in disruptive mob action?

no adverse action may be taken against the student on grounds which are not supported by any substantial evidence.

A federal district court will in appropriate circumstances review a student disciplinary proceeding to determine if the challenged disciplinary action was on grounds lacking support by any substantial evidence.

Roberds' claims of having been a mere spectator is somewhat incredible in view of all the evidence. Earlier he had inquired as to what would happen if he were to be a participant. This is indicative of his interest in being a participant.

He wrote a letter to Representative Cantrill indicating he was considering action not consistent with that of being a mere spectator. He witnessed the unlawful and destructive actions over a substantial period of time on two evenings and did not withdraw and disassociate on either of them from the unruly and destructive group. His actions at the scene of the demonstrations were of a type that reasonably could be deemed to be in the nature of encouraging, aiding, and abetting the demonstrations occuring rather than that of mere presence, innocent of any intent and conduct calculated to aid, abet, or encourage the occurrence. From all the evidence Dr. Lovinger could reasonably infer Roberds was a participant and not a mere, or innocent, spectator.[9] Hence, there was substantial evidence to support the disciplinary action taken against Roberds. This being so, it is unnecessary to consider Roberds' contention that the regulation mentioned "participation" in but did not mention "contributing to" certain mass demonstrations.

In conclusion, attendance at a tax supported educational institution of higher learning is not compulsory. The federal constitution protects the equality of opportunity of all qualified persons to attend. Whether this protected opportunity be called a qualified "right" or "privilege" is unimportant. It is optional and voluntary. It is also invaluable, for education is basic to civilized society and to its members.

█ The voluntary attendance of a student in educational institutions of higher learning is a voluntary entrance into the academic community. By such voluntary entrance, the student voluntarily assumes obligations of performance and behavior reasonably imposed by the institution of choice relevant to its lawful missions, processes, and functions. These obligations are generally much higher than those imposed on all citizens by the civil and criminal law. So long as there is no invidious discrimination, no deprival of due process, no abridgement of a right protected in the circumstances, and no capricious, clearly unreasonable or unlawful action employed, the institution may discipline students to secure compliance with these higher obligations as a teaching method or to sever the student from the academic community.

█ No student may, without liability to lawful discipline, intentionally act to impair or prevent the accomplishment of any lawful mission, process, or function of an educational institution.

█ A federal court should not intervene to reverse or enjoin disciplinary actions relevant to a lawful mission of an educational institution unless there appears one of the following:

(1) A deprival of due process, that is, fundamental concepts of fair play;

(2) Invidious discrimination, for example, on account of race or religion;

(3) Denial of federal rights, constitutional or statutory, protected in the academic community; or

(4) Clearly unreasonable, arbitrary or capricious action.

---

9. Although later in the same hearing he said he was only a spectator, he testified:

"Q. And Dr. Lovinger asked you if you were there and participated in these demonstrations on March 29th and March 30th, did he not? A. Yes, sir. Q. And you told him that you had, did you not? A. Yes, sir. Q. And you are telling this Court that now, are you not? A. Yes."

Careful review of the entire record convinces that none of the defendants engaged in conduct of the kind mentioned in any of these four items. There was substantial evidence to support the written charges brought by the college against Esteban and Roberds, and to support the college president's finding that plaintiffs had engaged in the conduct and acts with which they were charged. The written charges were based on portions of the college regulations relevant to a lawful mission of the educational institution. There was no failure to accord both procedural and substantive due process to Esteban and Roberds. They are not entitled to any of their requested relief.

This suit is hereby dismissed with prejudice.