Keith E. GARDENHIRE, by and through his father and next friend, Edgar Gardenhire, Plaintiff,

v.

E. L. CHALMERS, individually and as Chancellor of the University of Kansas, and the Board of Regents of the State of Kansas, William M. Balfour, individually and as Vice Chancellor for Student Affairs, University of Kansas, Defendants.

Civ. A. No. W–4522.

United States District Court, D. Kansas.

Feb. 1, 1971.

See also D.C., 326 F.Supp. 1207.

Chester I. Lewis, Jr., Wichita, Kan., for plaintiff.

Leonard D. Munker, Asst. Atty. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

THEIS, District Judge.

Keith E. Gardenhire was a student at the University of Kansas, at Lawrence,

Kansas, until December 10, 1970, when he was notified by letter that he was thereafter suspended from the university. The order of suspension was sent by the defendant William M. Balfour, Vice Chancellor for Student Affairs at the university.

On January 6, 1971, plaintiff filed this action seeking injunctive and declaratory relief and monetary damages. The plaintiff alleges that he was suspended without proper notice and hearing in violation of his Fourteenth Amendment right to procedural due process. An initial hearing was held in this Court on January 21, 1971.

The facts surrounding the suspension of Gardenhire are not in dispute. As stated above, he was a regularly enrolled student at the University of Kansas until December 10, 1970. The defendant Chalmers is the Chancellor of Kansas University and the defendant Balfour is the Vice Chancellor for Student Affairs. The other defendants are members of the Kansas Board of Regents. The suspension order received by Gardenhire contained the following language:

> "In accordance with the policies of the University of Kansas and regulations of the Board of Regents as distributed to all students at the beginning of the current semester, I am required to suspend you from the University on the grounds that evidence reported to me indicates that you were carrying a firearm on the Campus Monday, December 7, 1970."

In addition, Gardenhire was advised by Vice Chancellor Balfour that "in order to insure due process" Gardenhire had, at his discretion, the right of review of this action by the governing board constituted to handle disciplinary matters.

The parties agree that it is a violation of university rules to carry a firearm on the campus. The pertinent rule provides:

> "Effective February 7, 1969, only persons authorized to do so by the Chancellor or his designated representative shall carry firearms on the University

of Kansas Campus. Violation of this rule will result in immediate dismissal from the University."

The plaintiff has been charged in a state criminal complaint with carrying a concealed weapon and attempted murder of a fellow student. Although there has been substantial press coverage regarding an incident on the Kansas University campus involving Gardenhire, it does not appear in the written record before this Court whether the state charges have any connection with the Vice Chancellor's statement in the suspension order that evidence indicated that Gardenhire was carrying a firearm on campus. However, the State Attorney General, in his presentation here, has stated that a preliminary hearing was held binding the plaintiff over to the District Court of Douglas County, Kansas, on the criminal charges which were brought on the same factual basis as the alleged misconduct for which plaintiff was suspended.

Plaintiff's action is brought pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(3), (4), and 42 U.S.C. § 1983, and, in essence, he contends that he was entitled to a notice of the charges and a hearing involving due process prior to being suspended from the university.

The Court finds as a preliminary matter, and counsel for the defendants concede, that the jurisdiction of the Court over the parties and subject matter of this action has been properly invoked by the allegations of the complaint claiming that the defendants, under color of state law, have caused or permitted the plaintiff to be subjected to the deprivation of rights secured to him by the Constitution and laws of the United States.

The Court is confronted here with a clash or interrelation of a societal right and an individual right. First, it is unquestioned that the societal right is that of a government or sovereignty to protect itself and the many persons whom it represents from destructive conduct of other persons, singly or in groups, destined to damage the societal

fabric or endanger its constituency of individuals. Hence, the gun proclamation or regulation by the Chancellor prohibiting the carrying of a firearm on campus, was legally based and legally noticed to all students and university personnel through the campus newspaper, "The University Daily Kansan."

The individual right or privilege involved here and alleged to have been unconstitutionally infringed, is plaintiff's right to continue his education as a student at a state university, which is a personal and property right protected by the Fourteenth Amendment. As has been judicially noted in previous similar cases, this Court likewise takes notice that an extended absence from the university results in irreparable harm to a student, and that plaintiff has and will be irreparably harmed by a continuation of his suspension without legal foundation, if ultimately such be the case. See Stricklin v. Regents of University of Wisconsin, 297 F.Supp. 416 (D.C.1968).

The relationship between university and student, and more specifically, the question of whether the due process clause of the federal Constitution affords protection to the student faced with disciplinary proceedings brought by the university, is a subject that the federal courts have until recently uniformly refused to examine. It has been held that the federal courts lack jurisdiction to examine claims such as are presently before this Court, that a student enters a university as a matter of grace or privilege, and that the university stands *in loco parentis* to the student. Until the decision of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), it was consistently held that a student could be expelled "for whatever reason and by whatever procedure the university authorities thought proper." Wright, The Constitution on the Campus, 22 Vand.L. Rev. 1027 (1969).

■■ As a result of the decision in the Dixon case, a multitude of similar decisions in other federal courts during the past decade, and the recent decision by the Supreme Court in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), there is little doubt but that students maintain their constitutional rights in their relationship with the university and the proper procedure for enforcement of these rights is an action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. See General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (W.D.Mo.1968).

■ Any decision of the case at bar must start with the understanding that a tax-supported state university is to a certain extent an agency of state and federal government, and in itself a sovereignty. General Order, 45 F.R.D. 133, 138. It has the inherent authority to promulgate rules and regulations and to establish standards of conduct for those attending the institution. Likewise, it has the authority, if not the duty, to protect itself, its property, and other students in attendance. Esteban v. Central Missouri State College, 290 F.Supp. 622 (W.D.Mo.1968), affirmed 415 F.2d 1077 (8th Cir. 1969), cert. denied 398 U.S. 965, 90 S.Ct. 2169, 26 L. Ed.2d 548 (1970). In carrying out its lawful mission, and in enforcing its rules and regulations and standards of conduct, a university must afford students certain minimal procedural requirements of due process. Esteban v. Central Missouri State College, supra; Wright v. Texas Southern University, 392 F.2d 728 (5th Cir. 1968); Dixon v. Alabama State Board of Education, supra.

■ In applying the due process clause of the Fourteenth Amendment to university disciplinary proceedings, the courts should be careful not to impose upon the university any specific or particular procedural framework. Instead, the courts should accept any university procedure which is reasonably calculated to be fair to the student and lead to a

reliable determination of the factual issues involved. Wright, The Constitution on the Campus, supra, at 1060. The Court, in Due v. Florida Agricultural and Mechanical University, 233 F.Supp. 396, 403 (N.D.Fla.1963), expressed this by saying "the touchstones in this area are fairness and reasonableness." The Supreme Court has likewise held that:

"The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest. * * * The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria and Restaurant Workers' Union Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

Just recently, in the case of Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court was faced with the question of affording procedural due process to welfare recipients and held:

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168 [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as was said in Cafeteria and Restaurant Workers' Union, Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886, [895, 81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' "

Recognizing that the requirements of due process are flexible, it then becomes clear that different cases will call for different procedural safeguards. Where an infraction of university rules calls only for relatively mild sanctions, such as the loss of social privileges, it has been suggested that the procedures for affording due process to the student need not meet the same standards as would be required where suspension is possible. French v. Bashful, 303 F. Supp. 1333 (D.C.La.1969); Wright, The Constitution on the Campus, supra, at 1070.

The guidelines for colleges and universities to follow in student expulsion cases were first set forth by the United States Court of Appeals for the Fifth Circuit in the leading case of Dixon v. Alabama State Board of Education, supra, 294 F.2d at 158, 159, where the Court made the following statement:

"For the guidance of the parties in the event of further proceedings, we state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university. They should, we think, comply with the following standards. The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-

examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled."

The United States Court of Appeals for the Fifth Circuit recently reiterated these guidelines in Wright v. Texas Southern University, 392 F.2d 728 (1968).

In sum, after many cases touching on what is procedural due process in disciplinary actions against students, and as Professor Wright states in his excellent article:

"There is general agreement that four fundamental safeguards are required in every proceeding that may lead to a serious penalty. The student must be advised of the grounds of the charge, he must be informed of the nature of the evidence against him, he must be given an opportunity to be heard in his own defense, and he must not be punished except on the basis of substantial evidence. These requirements are so obvious, and so fundamental, that they require little elaboration."

(Wright, The Constitution on the Campus, supra, at 1071, 1072.)

■ In the case at bar, it is the procedure, or more accurately, the lack of any reliable fact-finding procedure that vitiates Gardenhire's suspension. There must be present, in order to insure fundamental fairness to the student, some fair and reliable method for determining the factual foundation, i. e., an evidentiary determination of the occurrence of the illegal conduct, which supports the university's decision to suspend a student. Gardenhire was never afforded any notice of the grounds of the charge, he was not informed of the witnesses or evidence to be used against him, and he was not afforded an opportunity to be heard in his own defense. In a case involving suspension, all of these must be present to insure fairness.

■ With respect to plaintiff's opportunity to be present at any hearing, the university did inform the plaintiff that he had the right of review. Suffice it to say, in the light of near unanimous authorities, the "right of review" (or a hearing only upon request), does not serve to protect the right of the student to fundamental fairness in this type of proceeding. One does not have to be a supplicant for allowance of a constitutional right.

The Attorney General argues that the doctrine of present and imminent danger in this case justifies the summary suspension which brings this case to the point confronting Judge Doyle in the bombing case at the University of Wisconsin, as reported in Stricklin v. Regents, supra. How and when may a university take immediate and summary action against those who violate its rules, most especially in situations rife with present and imminent danger to the lives and welfare of students, personnel and public, and the continuation of the educational life of a university?

In the present factual context before this Court, Kansas University had an absolute right—even a duty—to act in-

stantaneously against a gun-carrying and gun-using student on its campus, if the foundation fact were established, even by hearsay evidence, as appears to have been the case here. The university could suspend immediately for its protection upon a temporary or interim basis for a reasonable time, five to fifteen days, in this Court's estimation. Simultaneously, or within a few days after such suspension, the university should have notified the student and his parents, at their stated addresses, by some adequately formed written notice, capable of proof, of a hearing for the purpose of establishing the foundation facts of the accused student's alleged misconduct in an evidentiary hearing, and advising him to appear at the hearing to present his defense or show cause why the temporary suspension should not be made continuing or permanent, as to be determined by the hearing officer or body of hearing officials.

The University of Kansas actually has enacted and stated the basics necessary to satisfy legal student disciplinary action in both the "Code of Student Rights," presumably enacted by some official body at the university, and certainly distributed to each enrolling student through university officials, and in its "Senate Code 1970." The "Code of Student Rights" provides in Article 2, Section E:

> "No disciplinary sanctions may be imposed upon any student without notice to the accused of the nature and cause of the charges, and a fair hearing which shall include confrontation of witnesses against him and the assistance of a person of his own choosing."

The "Senate Code 1970" purports to establish a code of government for the university within the framework of statutory law and administrative control under such law by the State Board of Regents. In its Article XII, entitled "University Judiciary: Structure and Operation," under Section 6, subtitled "Pow-

ers," and Section 7, subtitled "Procedural Guaranties," the administrative machinery or procedure is set forth to handle disputes and disciplinary matters arising within the "University Community," as the Code generically describes the individuals living and operating on the university campus. The pertinent part of Section 6 states:

> "The Hearing Division of the University Judiciary shall have original jurisdiction over any charge or claim brought by one member of the university community against another member of the university community * * * *"

with apparent power of both adjudication and enforcement for "an alleged infraction of a previously published, valid university regulation," and "the allegedly improper, arbitrary or capricious acts of established university bodies or officials." Section 6 goes on to provide:

> "The Hearing Division shall also have jurisdiction to review de novo any disciplinary proceeding before, or any disciplinary action taken by, any other university tribunal, body or party, * * * *"

excepting cases involving traffic violations.

Section 7 sets out all the required and tested rules for procedural due process, and grants more rights to an accused not yet categorically held by courts to be necessary to minimal due process.

With this fine statement and elaborate machinery for the protection of rights, there has not been provided in a documentary manner, nor by custom in administrative action, any triggering device to set in motion from the university the fundamentals of procedural due process. Apparently, the suspended status of plaintiff has been in limbo between the date of suspension and the fruition of this action, while officials of the university and the attorney for plaintiff contended over the fine point whether plaintiff had to initiate admin-

istrative proceedings to enforce his claimed constitutional rights of due process, or the university, on its own initiative, had to give or provide such rights. The Court, as previously indicated, holds for the plaintiff on this point.

Plaintiff further seeks by his action here to have this Court:

"* * * (c) issue a preliminary and permanent injunction ordering defendants to (i) reinstate plaintiff to full student status retroactive to December 10, 1970; (ii) permit him to take his final examinations on the subjects in which he was enrolled at the time of his suspension, * * * and (e) grant damages in the sum of $15,000.00 for actual, punitive, physical, and psychological damages suffered as the result of the violation of his constitutional rights."

The Court notes from the record and statements of counsel that this plaintiff has at no time conceded he committed the alleged illegal act, i. e., "carrying a firearm on campus." If, in fact, he did not, as determined by proper university due process, his prayer is a proper one meriting the Court's further attention. On the other hand, if, in fact, he did the act, as found by proper due process, his prayer would appear to have questionable merit on any part. We are not dealing here with a situation similar to those involving the constitutional rights to be free of unreasonable search and seizure, or to remain silent where the evidence may be suppressed as a penalty for the bad judgment of a sovereignty in applying constitutional safeguards. Rather, the only penalty, detriment, or requirement upon the university is that it go back and start over. If the proscribed conduct is properly established, a plaintiff in a case such as this wins no prizes as a result of the initial university misstep, as aptly stated by Judge Oliver in Scoggin v. Lincoln University, 291 F.Supp. 161 (D.C.1968), relative to the facts in that case:

"Acceptance of the time-tested techniques of demagogy and glorification of the violence of the mob by a student to support what he may believe to be an ideal does not alter the nature of his conduct nor does his youth give him immunity from disciplinary action based on conduct that may violate a valid rule of a particular educational institution, to say nothing of violations of the civil and criminal laws that govern the society of which, whether he likes it or not, he is a part."

Accordingly, it is the order of this Court:

That the suspension or expulsion of plaintiff as of December 10, 1970, made in the letter of Vice Chancellor Balfour, be set aside, held for naught, and that plaintiff be reinstated as a student at the University of Kansas, effective as of 6:00 p. m. December 11, 1970, with the same rights, privileges and immunities which attached to his status as a student prior to his suspension or expulsion, and that such reinstatement continue until such final determination is made by Kansas University within the scope of due process with respect to the imposition or non-imposition of sanctions for alleged misconduct of plaintiff; provided, however, that this order will be stayed until March 1, 1971 at 10:00 a. m., during which period the defendants shall have the opportunity to institute, complete, and notify this Court of the result of a due process hearing on the question of the applicability of sanction of suspension or expulsion against the plaintiff relating back to December 10, 1970.

On March 2, 1971, at 10:00 a. m., this Court will take up and consider remaining aspects and issues of this case in the light of transpiring events.

Judgment is entered in accordance with the views expressed in this opinion without the necessity of further journal entry, and the Clerk shall transmit cop-

ies of this Memorandum and Order to the parties named herein, to Chester I. Lewis, attorney for plaintiff, and to Leonard D. Munker, Assistant Attorney General of the State of Kansas.