Vicki **MARZETTE**, a minor by her parents and next of friends, Pearl and Marcus Marzette; Henry Clay, a minor by his mother and next of friend, Nancy Clay; Geoffrey McCreary; Gladys Coleman, a minor by her mother and next of friend, Vivian Coleman; Jerry Benston, Jr., a minor by his father and next of friend, Jerry Benston; Kenneth C. Coulter, Jr., a minor by his father and next of friend, Kenneth C. Coulter; and Henry W. Browne, III, a minor by his father and next of friend, Henry W. Browne, II; Individually and on Behalf of others similarly situated, Plaintiffs,

v.

Eugene R. **McPHEE**, individually and as Director of the State Universities and as Secretary of the Board of Regents of the State Universities, et al., Defendants.

No. 68–C–199.

United States District Court
W. D. Wisconsin.

Dec. 9, 1968.

Percy L. Julian, Jr., Melvin F. Greenberg, Sander N. Karp, Madison, Wis., Lloyd A. Barbee, Milwaukee, Wis., Marc Stickgold, Detroit, Mich., for plaintiffs.

Bronson C. La Follette, Atty. Gen., Charles A. Bleck, Asst. Atty. Gen., E. L. Wingert, W. Scott Van Alstyne, Jr., Madison, Wis., for defendants.

JAMES E. DOYLE, District Judge.

The seven plaintiffs allege that they are Negroes who were students at Wisconsin State University-Oshkosh (hereinafter referred to as "the university") until November 22, 1968, when they were suspended. They undertake to sue on their own behalf, on behalf of all students at the university similarly situated, and on behalf of all students in the Wisconsin State University System similarly situated. The defendants are the director of the Wisconsin State Universities, who is also a member and secretary of the Board of Regents of the State Universities (hereinafter referred to as "the Board"); the members of the Board; and Roger E. Guiles, the president of the University.

Jurisdiction is invoked on the bases, among others, of 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3), 1343(4). The complaint sufficiently alleges, for jurisdictional purposes, that the defendants, un-

der color of state law, have caused or permitted the plaintiffs to be subjected to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States.

Plaintiffs have applied for a temporary restraining order requiring defendants to reinstate the plaintiffs and all other students similarly situated, pending a hearing in this court upon plaintiffs' prayer for permanent injunctive relief.[1] Affidavits and briefs in support of said application, and in opposition thereto, have been received, and oral argument has been heard.

On the present state of this record, comprehensive findings of fact cannot be made. However, from the complaint and affidavits certain facts appear to be agreed upon.

The affidavit of President Guiles, those of other administrators of the university, and that of a captain on the police force of the City of Oshkosh, with respect to many of the events of November 21, 1968, will be taken as fact solely for the purpose of acting upon the plaintiffs' present application for a temporary restraining order. These allegations have neither been disputed nor conceded on the present record in this action, except that each of the seven named plaintiffs alleges that he or she is innocent of any violation of the law or of any valid university regulation.

From these affidavits it appears that on that date, at about 8:40 a. m., a group of people entered Dempsey Hall on the university campus. This group consisted of about 94 persons. It included about 90 black students (among whom were the plaintiffs) and a few non-students.[2] These persons will be referred to hereinafter as "the group". The group moved to the second floor and massed outside the office of the president. About 40 surged into the president's individual office, in which he was present; among these was plaintiff McCreary, who appeared to be among the spokesmen and leaders of the group; these 40 entered without invitation, prior appointment, or permission. The remaining members of the group stood in the adjoining office of the president's secretary, in the president's reception room, and in the halls and other offices of the building. Members of the group stationed themselves at several telephones in the building to prevent their use.

The 40 who entered the president's individual office packed it, pressing upon the president tightly; some sat upon his desk; one seated himself in the president's chair; another sat in another chair with his feet placed upon the president's desk. One of the plaintiffs who was acting as a spokesman placed upon the president's desk a document containing certain "Black Student Union" demands with respect to university personnel, curriculum, and programs. The president was told to sign the document, signifying his acceptance of the demands. He was told that the group was not there for discussion, but only to obtain his signature. The president declined to sign, and attempted to explain that he was awaiting the report of a faculty committee on the subject. The conversation lasted about 20 to 25 minutes. The president was interrupted so constantly that he was unable to complete a sentence. A great many insulting, degrading, and humiliating remarks were directed at the president by many members of the group. Menacing gestures were made to him. From time to time members of the group took papers from a file or other objects and threw them on the floor. An architect's model of a new building was taken from a shelf and broken up piecemeal. Two vice-presidents of the university entered the president's office during this period.

---

1. Plaintiffs have also applied for a temporary order requiring defendants to expunge from the school records any notation of the suspensions. No urgency has been shown with respect to said relief.

2. At the time, about 115 of more than 11,000 students enrolled in the university were black.

They and the president were prevented, by the closed ranks of those present, from leaving the room.

At about 9:05 a. m., one of those present in the president's individual office shouted "do your thing". Immediately, persons present in his office began to throw typewriters to the floor, rifle files and scatter the contents on the floor, overturn a table, and tear draperies and blinds from the windows. The president was prevented from using the telephone.

Within a short time thereafter (the duration of which is not entirely clear from the affidavits, but appears to have been about five minutes), a number of destructive actions occurred in Dempsey Hall, including the following: Some members of the group ransacked the office of the president's secretary and the president's reception room, rifling the files and strewing the contents on the floor, slashing furniture, and overturning equipment. A member of the group broke the glass window in the locked door of the business office, also on the second floor, and a crowd entered it; outside windows of this office were broken, the window blinds damaged, office equipment overturned, the contents of files and other objects were strewn on the floor, and at least one typewriter was damaged. A large number of black people moved slowly through the first floor corridors breaking glass, damaging paintings, and upsetting statues; this was done behind a row of black people and individual acts of destruction could not be observed by the witness (Assistant Vice-President Richard G. Netzel); during this time, a person hurled an object through the glass portion of the locked door of the Financial Aids office on the first floor and unlocked it, about 30 to 50 black students then entered the office, and within about one minute desks were turned over, typewriters were hurled to the floor, chairs were used to break windows, and files were emptied onto the floor. At about 9:10 a. m. persons who had been engaged in these activities on the first floor ascended to the second floor. Also at about that time, a large number of black students massed in front of the open door of the executive offices on the second floor, and moved into the offices solidly massed together despite the efforts of three police officers to prevent them from entering.

Oshkosh police captain Kliforth received word of the disturbance at 9:04 a. m., and he and two other police officers reached Dempsey Hall about five minutes later; no other police officers were present at the time. Thereafter, until about 11:45 a. m., other police officers were arriving at Dempsey Hall. Apparently starting at about 9:30 a. m., efforts were made to clear students from Dempsey Hall and to prevent other students from entering it. However, prior to 11:45 a. m. no effort was made forcibly to remove anyone from the building, because the police force was not considered sufficiently large to accomplish this result. During a period of about two hours prior to 11:45 a. m., a police sergeant requested that the students who remained on the second floor of the building disperse; during this period, they were free to leave. Also during this period of about two hours, Vice-President Thedinga entered the executive offices on one or two occasions, one of which was at about 11:00 a. m., and was permitted by the black students present there to confer with the president.

At about 11:45 a. m., the students remaining on the second floor were advised that they were holding an unlawful assembly, and that if they did not disperse within two minutes arrests would be made on charges of unlawful assembly and disorderly conduct; about two minutes thereafter they were again advised by Captain Kliforth to disperse; about two minutes thereafter they were again advised by a police sergeant to disperse. The students refused to leave after being so ordered and advised; some expressed the desire to be arrested. The students who refused to leave were arrested on charges of disorderly conduct and unlawful assembly and conveyed to jail.

Most of the ensuing events with respect to the suspensions do not appear to be in dispute, although the record in this action is not complete. It appears that on Friday, November 22, the day following the disturbances, the president decided to suspend certain students temporarily, and on Monday, November 25, a written notice was mailed by the president by certified mail to the last known address of each of a number of students; the exact number and the identity of the students to whom the notices were mailed does not appear in this record, except that the seven plaintiffs and 60 other students have filed affidavits herein alleging that each of them received a copy of the notice.

The notice reads as follows:

"*Please take notice* that deeming it in the best interests of the university and pursuant to the authority of sec. 7.01, ch. VII of the By-laws of the Board of Regents of State Universities you are suspended from the Wisconsin State University-Oshkosh for engaging in conduct contrary to the provisions of sec. 37.11 Wis.Stats., and for engaging in conduct prohibited by said sec. 7.01 of the By-laws to-wit, did on November 21, 1968:

"a) interfere with the administrative functions and activities of the university and with its educational and service programs by breaking the peace through physical obstruction, coercion, noise, tumult and physical damage to state property.

"b) without authority occupy university facilities and block access to the following described areas in Dempsey Hall; executive suite, including the office of the president, business office and financial aids office.

"c) infringe upon the rights of students, faculty, staff and authorized persons to gain access to university facilities for the purpose of university activities.

"You may appeal this order of suspension by filing written notice in the office of the president, R. E. Guiles, Wisconsin State University-Oshkosh, Oshkosh, Wisconsin 54901 requesting a hearing.

"Written notice requesting a hearing must be received within ten days of receipt of this notice. Failure to request a hearing within the ten (10) day period will be deemed a waiver of any hearing and you will be expelled from the university.

"You are further advised that pending an appeal and decision you may not attend classes or use university facilities.

"Dated ―――――――

/s/ R. E. Guiles
President"

As of December 6, 1968, twenty-five students had filed requests for hearings.

Sec. 37.11(10), Wis.Stats., provides that the board of regents shall have the government and control of the university, and shall have power therefor "to confer by bylaws upon the [president] the power to suspend or expel pupils for misconduct or other cause prescribed in such bylaws." Section 7.01 of Chapter VII of the bylaws of the board is entitled "Student Conduct"; it will not be set forth in full here; it includes specific prohibitions against:

"a. Interference with accepted functions or activities of the university or with its educational or service programs, either by breach of the peace, physical obstruction or coercion, or by noise, tumult or other disturbance.

"b. Unauthorized occupancy of university facilities or blocking access to or from such areas.

"c. Interference with approved university traffic (pedestrian or motor vehicle).

"d. Infringement of the rights of students, faculty, staff, and/or other authorized persons to gain access to any university facility for the purpose of attending

classes, participating in interviews, university conferences and/or other university activities.

"e. Picketing, or demonstrating, with the use of obscene or indecent language, or with signs or banners containing such language or of such size, material or construction as to create a hazard to persons or property."

Section 7.01 also includes the following provisions, among others:

"Power is hereby conferred upon the president of each state university to suspend or expel students for misconduct, and for such other causes as may be prescribed from time to time in these by-laws."

"A student charged with conduct which may subject him to substantial disciplinary action should of course be afforded reasonable notice of the offense with which he is charged and the general nature of the evidence on which the charge is based, a reasonable opportunity to prepare and present any defense he may have, an adequate and fair hearing, and generally, procedural due process of law. He should be dealt with fairly in all respects; and the severity of the discipline when guilt is established should be reasonably commensurate with the gravity of the offense. If in any case the president shall determine that the best interests of the university or of the other students require it, the president may suspend the accused student temporarily, pending prompt determination as to his guilt."

Because of the November 21 disturbances and the resulting situation, the president closed the university for Monday, Tuesday, and Wednesday, November 25, 26, and 27. Thursday, Friday, and Saturday, November 28, 29, and 30, were previously authorized vacation time. The university resumed classes Monday, December 2. None of those suspended have been permitted to date to attend classes or to use university facilities. No university hearings have been held to date. At the oral argument herein December 6, the court was advised that on that day the board had met and had adopted the following resolution:

"Whereas the disturbance at Wisconsin State University-Oshkosh on November 21 which gave rise to the suspension of some 90 students presents questions of system-wide concern, and the large number of students involved creates exceptional problems of hearing procedure, and some of the alleged offenses were committed in the presence of President Guiles, who would normally be the final judge as to the penalties, if any, to be imposed, and he will be a material witness in the proceeding; therefore be it

"*Resolved* that Section 2 of Resolution 3178, be suspended with respect to the said matter at Wisconsin State University-Oshkosh and that in lieu thereof a hearing agent or agents be retained by the Board, by its Secretary, forthwith, to hear all disputed charges of misconduct against students arising out of the occurrence at Oshkosh on November 21, 1968, and to make findings as to conduct of the suspended students and to report his findings and recommendations to this Board, and that final determination await the report of such hearing agent."

The court was also advised orally at said hearing by counsel for the defendants, and by counsel's brief thereafter, that a distinguished former member of the Supreme Court of Wisconsin has accepted a retainer to serve as the hearing agent provided for in the above resolution; and that he will commence December 9 to perform his duties.

The immediate issue is whether any or all of the suspended students are entitled to reinstatement pending the holding of such disciplinary hearings as are

to be held, and pending the university's decision resulting from such hearing.[3] The defendants oppose such an order on two theories: (a) the suspension of each of said students since November 22 and his continuing suspension until the conclusion of further disciplinary proceedings, if any, in his case is a proper punishment for his misconduct on November 21; and (b) to reinstate the suspended students pending further disciplinary proceedings would endanger both the suspended students and other students at the university. I will refer to point (b) later in this opinion.

■ It has come to be generally recognized that with respect to discipline of students in public educational institutions, involving the possible imposition of serious sanctions such as suspension or expulsion, the requirements of procedural due process under the Fourteenth Amendment are applicable. Woods v. Wright, 334 F.2d 369 (5th Cir. 1964); Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed. 2d 193 (1961); Moore v. Student Affairs Comm. of Troy State Univ., 284 F. Supp. 725 (M.D.Ala.1968); Schiff v. Hannah, 282 F.Supp. 381 (W.D.Mich. 1966) (en banc); Esteban v. Central Mo. State College, 277 F.Supp. 649 (W.D.Mo. 1967); Knight v. State Bd. of Educ., 200 F.Supp. 174 (M.D.Tenn.1961). Assuming, as I do assume for the purpose of this opinion and order, that the substantive rules allegedly violated are valid, the courts have required observance of a number of procedural safeguards. These safeguards were recently summarized in Van Alstyne, The Student as University Resident, 45 Denver Law Journal 582, 593–594 (Special 1968) as follows (his citations to authority with respect to each safeguard are omitted here):

"(a) the student charged with an infraction has been furnished with a written statement of the charge adequately in advance of a hearing to enable him to prepare (e. g., 10 days);

"(b) the student thus charged 'shall be permitted to inspect in advance of such hearing any affidavits or exhibits which the college intends to submit at the hearing';

"(c) the student is 'permitted to have counsel present at the hearing to advise [him]';

"(d) the student is 'permitted to hear the evidence presented against [him],' or at least the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies;

"(e) the student or his attorney may question at the hearing any witness who gives evidence against him;

"(f) those who hear the case 'shall determine the facts of each case solely on the evidence presented at the hearing';

"(g) 'the results and findings of the hearing should be presented in a report open to the student's inspection';

"(h) 'either side may, at its own expense, make a record of the events at the hearing.'"

It is conceded that none of said safeguards has as yet been met here except insofar as they are met by the notices of suspension. Liberally construed, that notice might be considered an adequate specification of charges. (It must be

---

3. In a post-hearing brief, counsel for the defendants has vigorously attacked plaintiffs' standing to maintain this action on behalf of a class which includes all students who have been suspended because of the November 21 disturbance. I do not presently intend to foreclose this challenge to the propriety of the class action. However, under the circumstances present when this action was commenced on December 2, the class was so numerous and its membership so difficult for plaintiffs' counsel to ascertain that joinder of all the suspended students was impracticable; the other conditions required by Rule 23 of the Federal Rules of Civil Procedure appear, arguably at least, to be met. For the sole purpose of acting upon the application for a temporary restraining order, I conclude that the class action may be maintained on behalf of all of the suspended students.

noted, however, that apparently the same charges were embodied in the notice to each of the suspended students, and that the language contains no allegation of conspiracy or of aiding and abetting, so that it appears to charge each of said students with an identical set of sub-stantive offenses.) Whether the device of providing a hearing only upon re-quest meets constitutional requirements is a question with respect to which no authority has been cited, nor has any been found by the court in this short interval; I believe that the device may fairly be described as unusual.

But the central issue here concerns the status of these students pending final action in disciplinary proceedings.

The Association of American Colleges, the American Association of University Professors, the National Student Associ-ation, the National Association of Stu-dent Personnel Administrators, the Na-tional Association of Women Deans and Counsellors, and the American Associa-tion of Higher Education have recently approved a "Joint Statement on Rights and Freedoms of Students", one of the provisions of which is as follows:

> "C. *Status of Student Pending Final Action*
>
> "Pending action on the charges, the status of a student should not be al-tered, or his right to be present on the campus and to attend classes sus-pended, except for reasons relating to his physical or emotional safety and well-being, or for reasons relating to the safety and well-being of students, faculty, or university property." [4]

A somewhat similar policy appears to be reflected in Section 120.13(1), Wis.Stat., with respect to discipline in public high schools in Wisconsin. By the terms of that statute, an administrator's power to suspend is limited to a 3-day suspen-sion; only the school board may expel. I have recently held that expulsion by the board must follow the observance of rudimentary due process, notably speci-fication of charges, notice of hearing and hearing. Johnson et al. v. Day et al., 68–C–159, October 24, 1968. The sus-pensions here have continued for some time, of course, and threaten to continue for some considerable additional period while disciplinary proceedings are being had.

With respect to the specific problem presented here, a number of observations seem appropriate. With two exceptions, the record made here thus far does not contain an allegation concerning the spe-cific identity of any of the students in-volved in the events of November 21 in Dempsey Hall. The two exceptions are: an allegation by President Guiles that plaintiff McCreary was one of the 40 who initially crowded into his office and that McCreary appeared to be among the spokesmen and leaders of the group; an allegation by President Guiles that one of the plaintiffs (not otherwise iden-tified) who was acting as a spokesman for the group in the president's office was the person who placed the type-written demand upon his desk; it is not clear whether both references are to Mc-Creary. With these exceptions, there is as yet in this record no identification of the 40 persons in the president's individ-ual office, nor of those who performed any of the specific acts described in the several affidavits. From the content of the affidavits it seems reasonable to be-lieve that not everyone who has been suspended was among those who entered the Financial Aids Office, for example, nor among those who entered the Busi-ness Office. Thus, it appears that some differentiation among the acts of the suspended students is likely ultimately to be required.

In one respect, this may not be the case. Although the record is not explicit on the point, it may be that the category of students who have been suspended co-incides exactly with the category of stu-dents who refused, after three or more requests by the police, to leave Dempsey Hall. If this is true and if it can readily

4. 53 A.A.U.P.Bull. 365, 368 (1967).

be established, it appears relatively simple to conduct a hearing on this charge alone, determine the fact, and decide upon the appropriate sanction, if any, for this offense. Such procedure, of course, need not foreclose further disciplinary proceedings with respect to other offenses allegedly committed by specific students.

The events described in these affidavits cannot be recounted without evoking deep sadness; sadness in the memory of decades, even centuries, of injustice, the fruits of which are now so insistently with us; sadness that this legacy seems now to be producing a profound sickness in some of our people, including some of our younger black people; and sadness that some of them appear so unaware that there is a sickness there.

This is the reality with which we all struggle. The court appreciates the nature of the instinct which prompted the disturbance. The court appreciates the anxiety and shock induced in others by such bizarre behavior. The court appreciates that those who bear the heavy burden of governing our universities are solemnly obliged to take the necessary measures to preserve them against irrational assault.

Conduct by students of the kind described in the affidavits of the president and the other administrators is obviously constitutionally subject to severe sanctions, including suspension or expulsion. So long as the rules allegedly violated are themselves valid, those charged with governance of the university are not only free to proceed to discipline the offenders; they are duty bound to do so. But most particularly in complex and difficult situations, it is essential that those entrusted with the awful force of governmental power—regents, administrators, and courts—apply it carefully, precisely, justly. Faced with problems of such gravity, it would not be irrational to doubt the efficacy of some of the restrictions we have imposed by our constitution upon the exercise of governmental power. But we are committed as

a people to exist as a constitutional community and we must persevere in the convictions which prompted that commitment.

■■ I find that the plaintiffs and the members of their class (that is, the suspended students) will be irreparably harmed by any significant extension of their present suspension. I find that there is not available to them an adequate remedy at law. I find that this suspension has been imposed, and has been continued to the present, without due process of law. Because of the unusual circumstances in which this action has arisen, however, I have concluded that temporary injunctive relief should be conditioned and tailored in a manner which seems best calculated to preserve the competing values and interests to a maximum degree.

Accordingly, upon the basis of the entire record herein, it is hereby ordered:

That the students suspended by reason of the events of November 21, 1968, be reinstated as students at Wisconsin State University-Oshkosh, effective at 6:00 p. m., December 11, 1968, with the same rights, privileges and immunities which attached to their status as students prior to their suspension, and that such reinstatement continue until such time as final determinations are made within the university with respect to the imposition or non-imposition of sanctions by reason of the events of November 21, 1968:

provided, however, that none of the said students need be so reinstated if, prior to said day and hour, notice is served (by means of placing said notice in the mails addressed to his or her last known address) upon him or her of a hearing to be held not later than December 16, 1968, either upon the charges heretofore set forth in the notices of suspension, or upon newly drawn and stated charges; and provided, further, that a final determination is made within the university no later than December 20, 1968, with respect to said charges; and

provided, further, however, that said reinstatements need not be made by said date and hour if the defendants elect to file a motion with this court by said date and hour to the effect that such reinstatement be deferred for reasons relating to the safety of students, faculty, or administrators of the unversity, or university property. In the event such a motion is filed, it will be heard at 9:00 a. m., December 13, 1968, prior to which time the court will receive affidavits from the parties bearing on said issue of safety, and at which time the court will consider whether to receive testimony and documentary exhibits.