**TEXARKANA INDEPENDENT SCHOOL DISTRICT, Appellants,**

v.

**Velma LEWIS et al., Appellees.**

No. 8070.

Court of Civil Appeals of Texas, Texarkana.

Sept. 7, 1971.

John D. Raffaelli, Raffaelli, Hawkins & Carter, Texarkana, for appellants.

Sherman Kusin, Harkness, Friedman & Kusin, Texarkana, for appellees.

RAY, Justice.

This is an appeal by the Texarkana Independent School District from a judgment granting a permanent injunction in a class action enjoining the school district from suspending or expelling appellees and all other persons in the same class from the Texas High School at Texarkana, Texas, for past or future violations of regulations

promulgated by the Board of Trustees concerning disruptive behavior. This suit was brought in the trial court as a class action by the parents as next friends of eight students who were expelled and all others similarly situated. The case was tried before the court without a jury. Seventy-six students had been expelled by the Board of Trustees for the remainder of the Spring Semester of 1971 for alleged disruptive activities at the Senior High School. The Trial Court found basically the following:

1. That the suit was properly brought as a class action;

2. That procedural due process was not followed by school officials in that:

(a) the students were not given written notice of the charges against them;

(b) the students were not allowed sufficient time to prepare their defense;

(c) the students were not notified of their right of counsel; and

(d) the students were not notified of their right to have a record made of the evidence introduced at the hearing before the Principals.

The Trial Court further found that procedural due process was not followed by the Board of Trustees for each of the preceding reasons plus an additional finding by the Court that the Board of Trustees continued to hear evidence during its deliberations at a time when the students and parents were not present.

The Trial Court found further that the guidelines concerning disruptive activity adopted by the Board of Trustees and furnished to each individual student were vague and indefinite and in violation of the Constitution of the United States, and therefore null and void.

The Court granted a permanent injunction against appellants, enjoining them from suspending any students from attendance at Texarkana Senior High School in Texarkana for the balance of the Spring Semester, and from in any way interfering with appellees' attendance at the school at any time in the future until appellant school district adopted a method of holding and conducting hearings in connection with suspensions or expulsions which furnishes to the student or students involved procedural due process, both before the Principals and the Board of Trustees. The Court set out the following method for holding and conducting the hearings as guides for procedural due process:

"(a) that written notice be given to the student involved and to his parents in adequate time for them to prepare for the hearing;

(b) that a specific statement of the offense charged against the student be set out in the notice;

(c) that the student shall be informed in the written notice that he has the right to be represented by counsel at all hearings;

(d) that the student be informed in the said written notice that he may make a record at his own expense of the evidence introduced at the hearing, if he desires;

(e) that all testimony received either by the School Principals or by the Board of Trustees shall be introduced in the presence of the student; his parents and counsel, if they desire to be present, with the right of the student, his parents and counsel to cross-examine."

The appellants were further enjoined from suspending or expelling students until such time as appellants had adopted positive and definite guidelines for the discipline of students attending schools within the Texarkana Independent School District, and required copies of the guidelines to be furnished to each student with directions that guidelines be read by the student and delivered by the student to his parents.

This appeal by the school district and its officials is predicated upon four points of error which are as follows:

"First, that the Court erred in holding that the Appellant did not accord the plaintiffs procedural due process in the investigation and hearing of a matter involving disruptive activities at the school.

"Second, that in the investigation of a disruptive activity in which 212 students of a senior high school were involved in vandalism and in fighting between the black and white races on the school grounds during school hours, procedural due process does not require the fixed, mechanical, legalistic steps outlined by the trial court; and the Court was in error in enjoining the defendants in the future from suspending or expelling any student for misconduct until and unless the defendants have followed a method of procedure in accordance with the listed mechanical and legalistic steps fixed by the Court.

"Third, the Court erred in holding that the guidelines by the school concerning disruptive activities were unconstitutionally vague and indefinite.

"Fourth, the Court erred in granting a class action judgment."

The facts in this case are complex and lengthy, but basically the Board of Trustees of Texas High School had adopted a statement of policy concerning disruptive activities in October of 1969, following a previous disturbance at the school. Disruptive activities were categorized in the statement of policy as being major disruptive activities and minor disruptive activities. Major disruptive behavior carried a penalty of suspension for the remainder of the semester and failing grades in each of the courses in which the student was enrolled. The first category is defined as follows:

"Major disruptive behavior shall be interpreted to include any activity or action by any student that interferes with the normal routine operation of the school program, such as:

1. Demonstration;

2. Sit-ins;

3. Group violence;

4. Desecration of the American flag."

Minor disruptive behavior carrying a suspension from school for five days for the first offense and permanent suspension for the second offense was defined as follows:

"Minor disruptive behavior shall be interpreted to include any activity that interferes with routine operation of the school program, such as:

1. Disrespect or disobedience of school personnel;

2. Leaving class without permission;

3. Blocking corridors or hallways;

4. Harassment of students through name calling;

5. Use of vulgar or profane language."

It was agreed and stipulated that appellees had been furnished a copy of appellants' statement of policy outlined above.

The chronology of events pertinent to this case are as follows:

1. On Wednesday morning, February 17, 1971, before classes began, a disturbance started between some of the black students and some of the white students at Texas Senior High School in the student center of the building. The two groups were separated by members of the school administration, but approximately 500 students reassembled outside the building in the outer court area, where name calling and threats between the two groups continued. Principal W. E. McGuire announced over the intercom system that the students should go to class, at which time many stu-

dents started to their classes. However, a large group went to the eastern part of the school grounds, where fighting broke out, teachers were threatened, and cars were damaged by vandalism. When the disturbance could no longer be controlled by the administration, police officers were called to the scene to quell the disruptive activity. The disturbance had started at approximately 8:17 on Wednesday morning, and continued until approximately 8:40 a. m., when the police arrived. The doors to the school were locked about 8:45 a. m., and the classroom teachers were instructed to make a careful check and list all students who were absent from class at the first period. School was dismissed at 11:40 a. m., the same day, and that afternoon the entire staff of the school met to determine which of the absent students had been observed by any teacher or principal in the school building or on the school grounds that morning when the fighting had occurred. Those students who had been observed and identified, and who were not present for the first period class, totalled approximately 212 in number. The next day when those 212 students came to the Principal's office to get their absence slips in order to be readmitted to school, they were told to assemble in the school auditorium, where the Principal informed the students that they were temporarily suspended from school and that they and their parents would soon be contacted by letter.

2. On Saturday, February 20th, a letter was sent to all of the parents of the students who were absent from class on February 17th, and who had been identified as being present on the campus when the disruptive activity occurred. The letter informed the parents that their child was temporarily suspended from the school in connection with the disruptive activity, and that each parent should call the Principal's office to make an appointment.

3. On Monday, February 22nd, the parents of the students involved began coming to the Principal's office at regular intervals. The Principal and two assistant principals began the interviews in their separate rooms. Each child was given an opportunity to tell what he had done on the morning of the disturbance, and each parent was given an opportunity to add anything else that would enlighten the Principal on the activities of his child. The Principal or assistant conducting the hearing made a memorandum in writing of what each person said. This memorandum was read to the child and to the parent at the conclusion of the hearing for corrections or additions. Also, each child was given an opportunity to state in writing his actions concerning his activity on Wednesday morning. The hearings continued daily from Monday, February 25th, 1971. As a result of the hearings, 54 students were readmitted to school following the conclusion of the hearings. One hundred ten of the students were recommended to the Board of Trustees for expulsion for the remainder of the semester; forty-seven of the 212 pupils never appeared at the Principal's office, nor did they apply for readmission to school.

4. On Thursday, February 25th, 1971, the Superintendent of Schools mailed to the parents of the 110 students a letter stating that the School Board would act on the recommendations of the administration on the expulsion of the children. Each parent was given an opportunity to appear before the Board with his child, and with any additional information, by calling the Superintendent's office and having his or her name placed on the agenda.

5. On Friday, February 26th, the Trustees started their hearings which were concluded on Sunday, February 28th. At the conclusion of all the hearings, the Board reviewed the evidence as to each individual student involved, and voted on each student separately as to whether he or she was to be suspended for the balance of the semester, or reinstated. A majority vote of the Board was required for expulsion.

At the hearings held before the Board of Trustees, the parents and students were asked if they had any information in addi-

tion to that which they had given the Principal and, if so, such additional information was received. They were also asked if they had any other witnesses or other testimony. Afterwards, the memorandum made by the Principal at the preliminary hearing was read to the parents and to the students who were offered an opportunity to make any corrections or additions in the presence of the School Board. If the student involved had written a letter summarizing his activity in his own words, that was also read to the Board. Thereafter, the Trustees, school administrative officials and the school attorney asked whatever questions they deemed advisable and made notes of the answers of the students and the parents. All parents and students were allowed unlimited time within which to make whatever statement they wanted to make, and to introduce any evidence they desired. No witnesses were heard by the Board other than those in the presence of the student and his parents. Approximately 94 students appeared before the Board of Trustees. The Board reinstated 18 students and ordered 76 expelled.

6. On March 1st, telegrams were sent to each of the 76 students, notifying them of their expulsion.

7. Suit was filed in the District Court of Bowie County on March 3, 1971, and a temporary restraining order was granted the same day.

8. The case was heard on March 23, on its merits.

9. Judgment granting a permanent injunction was entered on May 25th, 1971.

Appellants' first and second points of error questioned the Trial Court's judgment in its holding that appellees were not afforded procedural due process in the investigation, hearing and ultimate expulsion or permanent suspension of 76 students.

Under Sec. 21.301 of the V.T.C.A. Texas Education Code, "The board of trustees of any school district may suspend from the privileges of the schools any pupil found guilty of incorrigible conduct, but such suspension shall not extend beyond the current term of the school."

The Board of Trustees has the following general powers as set out in Sec. 23.26 of the Texas Education Code:

" *  *  *

"(b) The trustees shall have the exclusive power to manage and govern the public free schools of the district.

" *  *  *

"(d) The trustees may adopt such rules, regulations and by-laws as they may deem proper."

While the Board of Trustees has ample authority to suspend or expel students, "it is without authority to suspend a student for any act or conduct, unless, prior thereto, the Board has promulgated a rule, regulation or policy generally covering such act or conduct for which the student is subject to being suspended, or unless the act or conduct constituted incorrigible conduct in violation of this article. (Art. 2904, Vernon's Ann.Revised Civil Statutes, now Sec. 21.301, Tex.Education Code). Such rule, regulation or policy may be informal, preferably written but may be verbal, as long as it fairly apprises the student of the type of prohibited conduct for which he may be suspended from school." Opinion of the Attorney General 1969, No. M–395.

It is clear that the Texas Legislature has delegated the authority of managing independent school districts and the disciplining of those students attending school within the district to the Board of Trustees and those persons employed by the Board.

The cases and legal articles concerning Constitutional rights of students are legion. The rules laid down by the courts in these cases concerning the Constitutional rights of students have developed a new line of law which this court chooses to

brand "institutional law," which is a combination of administrative law and criminal law. The courts have attempted to preserve the students' Constitutional rights, while at the same time they have tried to uphold the decisions of school administrative bodies. This is as it should be. Justice Langdon, in Passel v. Fort Worth Independent School District, 453 S.W.2d 888 (Tex.Civ.App. Fort Worth 1970, wr. ref'd, n. r. e.) quotes Stevenson v. Wheeler County Board of Education, 306 F.Supp. 97 (U.S.Dist.Court, Southern District of Georgia, Dublin Division, Nov. 17, 1969): "Among the things a student is supposed to learn at school (at least, such is my idea) is a sense of discipline. Of course, rules cannot be made by authorities for the sake of making them but they should possess considerable leeway in promulgating regulations for the proper conduct of students. Courts should uphold them where there is any rational basis for the questioned rule. All that is necessary is a reasonable connection of the rule with the proper operation of the schools. By accepting an education at public expense, pupils at the elementary or high school level subject themselves to considerable discretion on the part of school authorities as to the manner in which they deport themselves. Those who run public schools should be the judges in such matters, not the courts. The quicker judges get out of the business of running schools the better. * * * Except in extreme cases the judgment of school officials should be final in applying a regulation to an individual case."

An eminent scholar, Professor Charles Alan Wright in his article, "The Constitution on the Campus," (22 Vanderbilt Law Rev. 1027 at pp. 1071, 1072, 1969), states: "There is general agreement that four fundamental safeguards are required in every proceeding that may lead to serious penalty. The student must be advised of the grounds of the charge, he must be informed of the nature of the evidence against him, and he must be given an opportunity to be heard in his own defense,

and he must not be punished except on the basis of substantial evidence." In a case involving suspension, all of these must be present to insure fairness. Gardenhire v. Chalmers, 326 F.Supp. 1200 (D.Kan.1971).

The written notice mailed out by the Superintendent of Schools contained the following in the body of the letter: "The administration is recommending to the school that (name of student) be expelled from school for the remainder of the school term because of his/her part in the disruptive activities at Texas Senior High on February 17, 1971. The school board will act on the recommendations at a special meeting beginning at 7:00 o'clock Friday, February 26, 1971.

"If you wish to appear before the Board with any additional information, please call 792–0831 and have your name placed on the agenda."

■ The Trial Court was correct in holding that procedural due process was violated in the giving of written notice of the charges against the students. Since there are no pleadings in such hearings, it is necessary that the student be apprised with some particularity of the offense with which he is charged. It need not be drawn with the precision of a criminal indictment, but it should contain "a statement of the specific charges and grounds which, if proven, would justify 'discipline.'" Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961). "A student cannot be punished on the basis of some ground other than that stated in the written charge." 22 Vanderbilt Law Review 1027 at page 1072; Hammond v. South Carolina State College, 272 F.Supp. 947–950 (D.S.C.1967); Woody v. Burns, 188 So.2d 56, 57 (Fla.App.1966). We hold that appellants did not notify the student of the specific violation with which he was charged with such particularity as to avoid being in violation of the due process clause of the U. S. Constitution. The student should also be advised of the names of at least the principal witnesses against him

and the nature of their testimony. State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822, 826 (Tenn.1942), and it must be done in some adequate manner; Esteban v. Central Missouri State College, 277 F.Supp. 649–651 (W.D.Mo.1967); Dixon v. Alabama State Board of Education, supra, provides that the student must be given "the names of the witnesses against him and an oral or written report on the facts to which each witness testifies." In Gardenhire v. Chalmers, supra, the court stated: "Gardenhire was never afforded any notice of the grounds of the charge, he was not informed of the witnesses or evidence to be used against him, and he was not afforded an opportunity to be heard in his own defense. In a case involving suspension, all of these must be present to insure fairness." The person or administrative body charged with the duty of giving the notice to the student must make a good faith effort to deliver the notice to the student, but the right of the student to be heard in his own defense is lost if the student fails to attend at the appointed time, or if he has made it impossible despite diligent effort to give him notice of the hearing. Wright v. Texas Southern University, 392 F.2d 728 (5th Cir. 1968); Barker v. Hardway, 283 F. Supp. 228, 233 (S.D.W.Va.1968), affirmed 399 F.2d 638 (4th Cir. 1968).

■ We hold further that the student is entitled to a reasonable time within which to prepare for the hearing on a day certain, but this time may be shortened if the student so requests and the school authorities will not be unreasonably inconvenienced, so that the student may spend as little time as possible out of classes. The Trial Court was correct in its pronouncement of the first two guidelines for procedural due process, which were:

"(a) That written notice be given to the student involved and to his parents in adequate time for them to prepare for the hearing;

"(b) That a specific statement of the offense charged against the student be set out in the notice."

In these requirements, the Trial Court is affirmed.

II.

■ We cannot agree with the Trial Court in the requirement,

"(c) That the student shall be informed in the written notice that he has the right to be represented by counsel at *all* hearings." (Emphasis added)

No doubt, justice would be more effectively and efficiently administered if counsel for the student were present, but the presence of counsel is not mandatory where counsel for the school is not present. Madera v. Board of Education, 386 F.2d 778 (2nd Cir. 1967). However, the student's right to counsel, should the matter appear to him to be of sufficient gravity to make legal assistance desirable, should receive ungrudging recognition. If, however, the Board of Trustees proceeds through counsel, as it did in this case, at the hearing before the Board, then the student has the right to be represented by counsel of his own choice at his own expense, and in this instance the Board of Trustees shall notify the student in writing that he has a right to be represented by counsel. This shall be true in all preliminary hearings where the school district proceeds through counsel, and particularly when the school intends to expel the student. It is not necessary to notify the student of his right to counsel in preliminary hearings before the superintendent, principal or administrative committee when the school district does not elect to proceed through counsel and does not intend to expel the student. Madera v. Board of Education, supra; Wasson v. Trowbridge, 382 F.2d 807, 812 (2nd Cir. 1967).

## III.

■ The guideline set out by the Trial Court stating,

"(i) That the student be informed in the said written notice that he may make a record at his own expense of the evidence introduced at the hearing, if he desires,"

while desirable, is not absolutely mandatory. In Due v. Florida A. & M. University, 233 F.Supp. 396 (D.C.M.D.Fla. Tallahassee Div.1963), the court stated:

"A fair reading of the Dixon case shows that it is not necessary to due process requirements that a full scale judicial trial be conducted by a university disciplinary committee with qualified attorneys either present or formally waived as in a felonious charge under the criminal law. There need be no stenographic or mechanical recording of the proceedings. Procedures are subject to refinement and improvement in the never-ending effort to assure, not only fairness, but every semblance of fairness. More specific routines of notice and advisement may be indicated in this regard, but a foisted system of rigid procedure can become so ritualistic, dogmatic, and impractical as to itself be a denial of due process. The touchstones in this area are fairness and reasonableness."

## IV.

The fifth guideline of the Trial Court states:

"(e) That all testimony received either by the school principals or by the Board of Trustees shall be introduced in the presence of the student, his parents and counsel, if they desire to be present, with the right of the student, his parents and counsel to cross-examine."

In a number of cases, students have been allowed to confront the witnesses against them, and to cross-examine these witnesses, but this is not ordinarily a matter of right. Jones v. State Board of Education, 279 F.Supp. 190–194 (M.D.Tenn. 1968); Esteban v. Central Missouri State College, supra. In Dixon v. Alabama State Board of Education, supra, Judge Rives wrote:

"This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out."

While this case dealt with colleges, it is no less applicable to elementary and high schools. Other courts have agreed that confrontation need not be permitted as a matter of right. Wong v. Hayakawa, No. 50983 (N.D.Cal. Apr. 24, 1969); State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822–826 (1942). However, see 22 Vanderbilt Law Review 1027–1076, supra, in which Professor Wright states:

"Professor Clark Byse has taken a more discriminating view which I find convincing. This is that there is no right routinely to confrontation, but that confrontation and cross-examination may be required where they are the conditions of enlightened action. Thus, in many cases and with regard to many witnesses, the tribunal is free to accept affidavits and to refuse confrontation. But, if the case resolves itself into a problem of credibility and a tribunal must choose to believe either the accused or his accuser, cross-examination is the condition of enlightened action and is therefore required in the interest of fairness and reasonableness."

■ We hold that the right to cross-examination and confrontation is not mandatory, but may be desirable in those circumstances involving the credibility of witnesses. It is important to note, however, that Boards of Trustees do not have

subpoena power, nor do they have power to administer oaths.

## V.

There can be no doubt that the school administration and the Board of Trustees had a very difficult problem which demanded prompt and decisive action. This was the second time this particular school had been plagued with violence and rioting, and the school officials were all doing their best to preserve law and order and, at the same time, to get the school back into operation as soon as possible. One of the important questions in this case is whether or not a student may be temporarily suspended without a hearing. We hold that a school superintendent, or principal in the absence of the superintendent, may temporarily suspend a student for, five school days, or such other reasonable time as the circumstances may demand, without a preliminary hearing where there is a clear and present danger to the students' physical or emotional safety and well-being, or for reasons relating to the safety and well-being of students, faculty and school property. 2 Texas Tech.Univ. Law Review 271, 275, Brakebill—"Suspension of Student Pending Disciplinary Hearing" (1971); Stricklin v. Regents, 297 F.Supp. 416–420 (W.D.Wis.1969); Marzette v. McPhee, 294 F.Supp. 562, 568–570 (W.D.Wis.1968); Buck v. Carter, 308 F. Supp. 1246 (D.C.Wis.); Scoggin v. Lincoln University, 291 F.Supp. 161, 172 (W. D.Mo.1968); Vermillion v. State ex rel. Englehardt, 78 Neb. 107, 110 N.W. 736 (1907). Interim suspension presupposes a prompt hearing. Marzette v. McPhee, supra; Knight v. State Board of Education, 200 F.Supp. 174, 178 (M.D.Tenn.1961). A student on request must be given a preliminary hearing to determine the propriety of his interim suspension. Stricklin v. Regents, supra. We feel that the right to prompt temporary suspension is necessary to the curbing of violence and rioting when it occurs on the campus. However, a preliminary hearing is required before a student can be temporarily suspended where no danger is involved, such as cases of alleged cheating by a student.

In cases in which the student is temporarily suspended before a preliminary hearing, it is incumbent upon the school authorities to promptly furnish the student with written notice of the charges against him, as previously outlined in this opinion.

The student may waive preliminary hearing when it is required and accept the temporary suspension or permanent suspension. For the protection of the school, it would seem advisable to have the waiver in writing and signed by both the student and at least one of his parents, or his guardian.

## VI.

The Trial Court erred in holding that the guidelines adopted by the school concerning disruptive activities were unconstitutionally vague and indefinite. There is a very narrow gap, and a great danger of confusion, between the notion of a guideline void for overbreadth and a guideline valid on its face, though it might be unconstitutionally applied. In this case the guidelines were unconstitutionally applied to some of the students. There were students who were only spectators who were expelled for the remainder of the school semester. It is obvious that they were not guilty of major disruptive activity. Their suspension should have been for only five days, as outlined by the minor disruptive activity of leaving class without permission. There can be no discipline imposed except on the basis of substantial evidence of a violation of one or more specific rules or policies of the school. Jones v. State Board of Education, 279 F.Supp. 190, 200 (M.D.Tenn.1968); Scoggin v. Lincoln University, supra.

David Campbell and Craig Lewis should not have been expelled from school for the balance of the Spring Semester, because they did not participate in any major dis-

ruptive activity. The evidence shows they were only spectators. All students who were mere spectators and failed to return to school for their first period class should have been suspended under the minor disruptive penalty for leaving class without permission. We hold the guidelines and statement of policy relative to conduct of students in this case are not so vague and indefinite as to be unconstitutional. Sullivan v. Houston Independent School District, 307 F.Supp. 1328, 1343–1347 (D.C. 1969). Appellants' Third Point of Error is sustained.

## VII.

Appellants' Fourth Point of Error is that the court erred in granting a class action judgment. We hold that a class action was authorized by Rule 42(a) (3), Woods v. Wright, 334 F.2d 369 (5th Cir. 1964) ; Sullivan v. Houston Independent School District, supra. The pertinent parts of the rule are as follows:

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is,

\* \* \* \* \* \*

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

Obviously, each student could have brought a separate action in this controversy, but the court could have consolidated all of the cases for one hearing. The better practice seems to be to allow all of those persons similarly situated to proceed in one suit. This type of class action is commonly called a "Spurious" class action. McDonald Texas Civil Practice, Sec. 3.341.

"Joinder of the parties is neither necessary nor indispensable. The spurious class action is a permissive joinder device. Even before the adoption of the rules, the Texas Courts had allowed a spurious class action. Such an action stands as an invitation to others affected to join in the battle and an admonition to the Court to proceed with proper circumspection in creating a precedent which may actually affect non-parties, even if not legally res judicata as to them. Beyond this \* \* \* it can not make the case of the claimed representative stronger, or give them rights they would not have of their own strength, or affect legally the rights or obligations of those who do not intervene."

All-American Airways v. Elderd, 209 F.2d 247 at 248 (C.A.2d 1954). While common relief may be sought in such class action, it is not necessary that the Court grant common relief. The 47 students who were notified that they could appear at the principal's office and before the Board of Trustees, but made no appearance, would have waived their rights to be heard, except for the fact that they were permanently suspended from school without being given notice of the reason for their suspension with such particularity as would afford them due process under the United States Constitution. If these 47 students had been given a proper notice but later failed to appear before the Board of Trustees at the appointed time, they would have waived their rights to appear and could have received no injunctive relief through the class action. Wright v. Texas Southern University, supra; Scott v. Alabama State Board of Education, 300 F.Supp. 163 (D. C.Ala.) ; Buck v. Carter, supra. All of the 76 students were similarly situated because they had all been suspended without proper notice and they had a common question of law concerning whether the notice given to them met the notice required by the due process clause of the United States Constitution.

"The fact that each member is subject to the same specific sort of deprivation of

constitutional rights as the representative parties is enough."

Sullivan v. Houston Independent School District, supra. Appellants' Fourth Point of Error is overruled.

This Court is compelled to point out that the school authorities had available to them other courses of action and other remedies in this matter. Section 21.302 of the Texas Education Code provides for action against the student in the Juvenile Court when the student is "insubordinate, disorderly, vicious, or immoral in conduct, or who persistently violates the reasonable rules and regulations of the school * * *." Further, Article 295a of the Vernon's Ann.Texas Penal Code defines disruptive activities on the campus and provides the penalties for such conduct. See also Article 295b, Texas Penal Code; and now Article 295c just enacted by the 62nd Legislature in Chapter 258 (1971). There were other violations of the Penal Code of Texas which would have justified criminal actions against the more vicious students.

The judgment of the Trial Court will be modified by the deletion of its Paragraph III ordering the adoption of new guidelines for the discipline of students attending Texarkana Independent School District, and as further modified herein the judgment of the Trial Court is affirmed.

CHADICK, Chief Justice (concurring).

On consideration of the entire record, I think the judgment of the Trial Court should be affirmed, except that portion thereof reading as follows:

"III. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants, A. T. Hay, Chairman, J. C. Crownover, James Ward, Glenn Moses, James H. Thomas, and J. B. Rochelle, III, Members of the Board of Trustees of the Texarkana School District, be enjoined and directed to adopt guidelines for the discipline of the students attending the schools within the Texarkana Independent School District which guidelines must be positive and definite, and that copies of the said guidelines shall be furnished to each student with directions that the said guidelines shall be read by the student and delivered by the student to his parents."

In other words, I would reverse and render as to the matter covered by the copied paragraph and delete such order from the judgment and affirm the Trial Court's judgment as modified. Briefly, my reason for so doing is compelled by the posture of the parties, both in the trial court and on appeal, and the consequent reduction their positions impose on the scope of review or revision this Court may undertake.

The statement of the nature of the case in appellants' briefs concludes with these two paragraphs, to-wit:

"The appellants herein are not seeking to have the injunction granted by the trial court set aside or dissolved, insofar as the students who were involved in this case, either as named plaintiffs or as class plaintiffs, are concerned.

"This appeal involves only the questions of the procedural due process to be followed in the future concerning similar disruptive activities, and the legal sufficiency of the guidelines handed down by the School District concerning such activities."

The appellees' brief directs this Court's particular attention to these two paragraphs in the appellants' brief, but does not comment on the significance or the effect thereof. The judgment grants nothing but injunctive relief to the complainants, that is, to the named plaintiffs and the class plaintiffs, except in the incidental matter of taxing costs. Though put in doubt as to the intent of the quoted statement by its broad and general nature, I feel the statement should not dispose of the case, as the prayer in the appellants' brief, as does the

fact that a brief was filed, indicates that the appellants did intend to reserve certain questions for review. The prayer is as follows:

"WHEREFORE, appellants pray that this Honorable Court reverse the judgment of the trial court and hold:

"(a) That procedural due process was followed by the principal and assistant principals in the hearings and investigation of each student who appeared before them;

"(b) That procedural due process was followed by the Board of Trustees as to each student who appeared before the Board of Trustees, other than the students, David Campbell and Craig Lewis;

"(c) That procedural due process was not followed by the Board of Trustees as to David Campbell and Craig Lewis only by reason of the fact that there was not substantial evidence as to their having participated in group violence;

"(d) That the Statement of Policy, commonly called the 'guidelines' laid down by the Board of Trustees, is not vague and indefinite and in violation of the Constitution of the United States.

"(e) That the trial court was in error in granting a permanent injunction as to all of the named plaintiffs except David Campbell and Craig Lewis; and,

"(f) That the trial court was in error in granting a permanent injunction as to the class plaintiffs.

Appellants further pray that this court dissolve the permanent injunction issued by the trial court, except insofar as the defendants were enjoined: (a) from suspending the named plaintiffs and the class plaintiffs (as to all of whom the question is moot), and, (b) from in any way interfering with the completion by them of their education for the Spring Semester for the year 1971.

"Appellants further pray that this cause be remanded to the trial court with instructions to enter final judgment therein in accordance with the opinion of the Court of Civil Appeals * * *."

Though I recognize the need to curtail and condense this expression of my views, nevertheless, I must point to this further anomaly in the posture of the parties. The following, which I take to have the dignity of a stipulation, appears in the statement of facts:

"MR. PATTON: Your Honor, before the defense puts on any witnesses, on behalf of all the plaintiffs, we'd like to move that the testimony on the behalf of the defense be limited to that type of testimony which would tend to rebut due process violation.

"MR. RAFFAELLI: I have no objection to that, if they will limit their testimony to the same thing and not ask this court to make specific findings as to whether or not the evidence was sufficient to justify the expulsion or suspension of any one student. That's what I moved in the beginning.

"THE COURT: Yes, I don't propose to make such a finding."

On its face, this appears to be a stipulation by counsel for the plaintiffs, acquiesced in by the trial judge, that individual or *several* relief for a particular plaintiff was not to be an issue in the case and judgment of that nature would not be entered at conclusion of the trial. Such being the agreement, the suit became at that point an action to vindicate the rights of the group, and to afford the group or class joint rather than several relief, if relief was in order. Perusal of the record and the judgment entered confirms that the trial court pursued this theory to the end, and I understand the judgment to only intend joint relief to the group as a whole.

The appellants have a point of error questioning the propriety of a class action

judgment, and the appellees counter that a class action judgment is permissible. I would sustain the appellants' point to the extent previously stated. The Texas class action rule (Tex.R.Civ.P. 42) was, I understand, the Federal rule verbatim when adopted. The Federal rule was changed in 1966 so that Federal courts might, when the facts warranted it, entertain and render judgment granting relief to a class in cases such as this, that is, in a *spurious* * class action. See Charles Alan Wright, Class Actions, 47 Federal Rules Decisions, 169 (at page 175). Prior to the Federal rule change, a judgment for relief in a spurious class action, as is the Texas class action rule now, was several in its nature and was binding only on the named parties and intervenors, and therefore, not res judicata to any except named parties and intervenors in the lawsuit. See Prof. Wright's article just cited, and 1 McDonald's Texas Civil Practice, "Parties", Sec. 3.34.1.

As I understand it, the trial judge undertook to render a judgment granting relief to a group constituting a class of persons similarly situated, and the trial court did not intend to grant individual, separate or several relief to a particular person. With this view of the record and the restriction placed on the appeal by the appellants' brief, I have reached the conclusion formerly stated that the only portion of the judgment that should be reversed is the paragraph enjoining and directing the school board to adopt guidelines, etc. The quoted stipulation barred several relief, and the pleadings and proof precluded joint class relief. When the stipulation putting individual actions aside is given effect, this record, in my opinion, does not show school policy and procedures were constitutionally defective or were unconstitutionally applied to the complainants as an adversary class.

I understand Judge Ray's order to be in harmony with the disposition of the appeal that I suggest, so I concur in such order.

DAVIS, Justice (dissenting).

I dissent. This is an attempted appeal from a permanent injunction that was erroneously granted against the school teachers and the Board of Trustees of the High School of the Texarkana Independent School District. Seven minor students attempted to bring a "class action" for themselves and in behalf of 69 other minor students. The seven who brought the action did not have anything to do with the riot that occurred on the Texarkana Independent School District grounds and in the Student Center Building of the Senior High School. The riot was brought about by the white students and the black students because of forced integration. The trouble started at approximately 8:17 a. m. and continued until 8:40 a. m. when the police arrived. One of the teachers announced over the intercom system that the students should go to their classes. A large group of the students went to the eastern part of the school grounds. The students were cursing each other, making threats, using profane and obscene language. Fighting started, cars were damaged during the riot, and many locked doors in the school building were knocked open and broken out.

The doors of the school building were locked about 8:45 a. m. The classroom teachers were instructed to make a careful check and list all students who were absent from class during the first period. School was dismissed at 11:40 a. m. It seems that in the afternoon, the entire staff of high school teachers met to determine which of the students were absent or had been observed by any teacher or the principals of the school in the school building or on the grounds of the school that morning when

---

* Unfortunate terminology has been employed by legal writers to differentiate between the class actions authorized by Rule 42. These are said to be *true*, *hybrid*, and *spurious*. The latter term, spurious, does not denigrate or taint the perfectly respectable pleading herein.

the riot began. The students who were not present in the first class period amounted to 212. When the 212 students came to the principal's office to get their absence slips in order to be readmitted to school, they were told to assemble in the school auditorium. There the principal informed them that they were temporarily suspended from school and their parents would be notified by letter.

In order to shorten this dissent, I will say that an administrative hearing by the teachers commenced on February 22, 1971, after each student had been given notice thereof, and was concluded on February 25, 1971. As a result of the administrative hearing, 54 minor students were readmitted to school. One hundred ten of the minor students were expelled for the remainder of the semester. Forty-seven of the minor students did not appear at the administrative hearing nor apply for readmission to school.

On February 25, 1971, the Superintendent of the school mailed to the parents of the 110 students who were expelled a letter to that effect. Each parent was given an opportunity to appear before the Board of Trustees with his child. They were given an opportunity to produce any pertinent information by calling the superintendent's office and having their names placed on the list.

On February 26, 1971, the Board of Trustees started its administrative hearings. They were concluded on February 28, 1971. At these hearings, the parents and the minor students were allowed to give any information they desired. Some of the minor students made a memorandum in writing at the administrative hearing. It was read to the parents and to the minor students in the presence of the Board of Trustees. Some of the students had written letters describing their activities in their own words. They were also read to the Board of Trustees. No witnesses were heard by the Board of Trustees other than in the presence of the students, their parents, the teachers, and the Board of Trust-

ees. Approximately 94 students appeared. The Board of Trustees reinstated 18 students. They expelled 76 students.

On March 4, 1971, this suit was filed, in which a Temporary Restraining Order was sought by 7 minor plaintiffs involved, as a "Class Action" to prevent seventy-six minor students from being expelled from school.

The minor plaintiffs alleged in Paragraph 2 of their Original Petition as follows:

"Plaintiffs bring this action on their own behalf and on behalf of the other individuals similarly situated, because the group of students subjected to or threatened with suspension or expulsion in violation of their constitutional rights is so numerous that joinder of all members is impracticable, and *questions of fact and law* exist in common to the class. The constitutional claims of the plaintiffs are typical of the claims of the class. The *representative parties will fairly and adequately protect the interest of all Texas High School students.* The prosecution of separate actions by individual students would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants." (Emphasis added).

These allegations are wholly untrue because there were different questions of fact and questions of law that existed among the several minor students. They further alleged that it was brought as a "Class Action" under Rule 42 T.R.C.P., under the 14th Amendment of the Federal Constitution, under the 1st Amendment of the Federal Constitution, and under Sec. 21:301 of the Texas Education Code. In Appellees' behalf, it is argued most fully that Rule 23 of Federal Rules of Civil Procedure was applicable to class actions by or against minors or infants.

First, let us examine the transcript as a whole. It was presented to a visiting

Judge who signed a Temporary Restraining Order on March 5, 1971, at 3:20 o'clock p. m. In the Temporary Restraining Order he did not set a date, time of day or a place for a hearing on the Application for a Temporary Injunction. That part of the Temporary Restraining Order which is supposed to set a hearing date, time of day and place for the Application for Temporary Injunction reads as follows:

"It is further ordered that Plaintiffs' application for a temporary injunction effective until final decree herein, as contained in his verified petition, be heard before me at _____ o'clock on the _____ day of _____, 1971, in the District Courtroom in the Court House of Bowie County, in the City of Boston, Texas."

On March 22, 1971, another visiting Judge signed and entered the following Order:

"ORDER EXTENDING TEMPORARY RESTRAINING ORDER AND RESETTING HEARING

"On this the 22nd day of March, 1971, the above entitled numbered cause came on for hearing on Plaintiffs Application for Temporary Injunction pursuant to the Order of the Judge made herein on the *2nd day of March*, 1971, and it being impossible to consider said application for the reason that the Court is engaged in another matter and it is therefore ORDERED that the hearing on Plaintiffs said Application for Temporary Injunction is hereby continued to and reset for the 1st day of April, 1971, at 10:00 o'clock a. m. in the County Building of Bowie County, Texas, in the City of Texarkana, Texas, and that the temporary restraining order heretofore issued in this cause be and the same is hereby continued in full force and effect until said time.

"This the 22nd day of March, 1971, at 9 o'clock a. m." (Emp. added).

On March 23, 1971, Appellants filed a Special Exception to Paragraph 4 of the Plaintiffs' Original Petition for the reason that the same alleged an inquiry as to a matter of fact, to-wit: "the sufficiency of the evidence against the plaintiffs, and the plaintiffs have failed to pursue their administrative remedies by appealing to the State Board of Education to determine the sufficiency of the evidence against them as to the charge." There is no showing that this special exception was ever acted upon. If so, this writer thinks it should have been sustained. In an administrative hearing, you have to pursue these routes before you are permitted to enter a court.

On March 23 and 24, 1971, this case was tried by another visiting Judge on the theory of a permanent injunction. In the Judgment that was signed and entered, it is stated that on *March 3*, 1971, a Temporary Restraining Order was entered and a hearing on the Application for Temporary Injunction was set for March 12, 1971. No such Order appears in the record. The Judgment further says that on March 12, 1971, the Temporary Restraining Order was continued and a hearing on the Temporary Injunction was reset for March 22, 1971. No such Order appears in the record. The Judgment further says that on March 19, 1971, the Temporary Restraining Order was continued, and hearing on the Application for Temporary Injunction was set for a "later date." No such date is listed. The Judgment further says that on March 22, 1971, the case was set for trial on its merits and the Application for a Permanent Injunction beginning on March 23, 1971. No such Order appears in the record. Anyway, the visiting Judge signed and entered an Order granting the Permanent Injunction on May 25, 1971. From that Judgment, Appellants have perfected their appeal. They bring forward four points of error.

Under the record in this case, this writer does not feel that the District Court ever acquired jurisdiction to grant a Temporary

Restraining Order, Temporary Injunction or a Permanent Injunction. A Temporary Restraining Order must fix a date, place, and hour to hear an Application for a Temporary Injunction. This the trial Judge did not do. We are bound by what the record reveals. Appellees base their suit solely upon the theory of "due process of law," and a "class action" on behalf of a group of minors.

Hundreds of decisions have been written upon the question of "due process of law" in civil suits, administrative proceedings, and criminal cases. 13A Words and Phrases 159 to 376. A careful examination of those cases will show that many Trial Judges and administrative proceedings were not held according to the "due process of law."

"Due process of law" is described in the dictionary as: "A limitation of the U.S. Federal and State Constitutions that restrains the actions of the instrumentalities of government within limitations of fairness." This, as I see it, is an extremely broad definition. How would an administrative officer or body of officers be able to understand the "due processes of law" as guaranteed by the 1st and 14th Amendments of the Federal Constitution when the officer or body of officers are not lawyers. There are many, many definitions handed down by many appellate courts as to what constitutes actual "due process of law." The definitions go all the way from barbering, beauty culture, brokers, cattle, child support, colleges, Universities, public schools, common law, competent counsel, competent tribunal required in condemnation proceedings, and many, many others. I have carefully searched the U.S. Constitution, all the Federal Statutes and the Federal Rules of Civil Procedure, and I cannot find anything in them that will permit a "class action" to be brought for or on behalf of minor plaintiffs or against minor defendants.

Federal Rules of Civil Procedure, 17(c), reads as follows:

"(c) Infants or Incompetent Persons: Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his *next friend* or by a *guardian ad litem*. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person. (Emp. added).

There is not one single word, phrase or sentence in Rule 23 of the Federal Rules of Civil Procedure that permits "class actions" to be brought by or against a group of minors. For the benefit of the public, I will copy Rule 23 of the Federal Rules of Civil Procedure:

"Rule 23. *Class Actions*

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members

of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(c) *Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

(2) In any class action maintained under subdivision (b) (3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

(3) The judgment in an action maintained as a class action under subdivision (b) (1) or (b) (2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b) 3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c) (2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the

court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

(e) *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

I have examined the Texas Constitution, Texas Statutes, and Rules of Civil Procedure. I cannot find any Constitutional Provision, any Statute or any Rule of Civil Procedure that will permit a "class action" by or against a group of minor plaintiffs or minor defendants. Article 5, Section 8, of the Texas Constitution, Vernon's Ann.St., gives to the District Courts jurisdiction and general control in probate matters over the County Court, appointed guardians, granting Letters Testamentary and of Administration, Probating Wills or Settling the Accounts of Executors, Administrators, and Guardians, and for the transaction of all business appertaining to estates; and ORIGINAL JURISDICTION AND GENERAL CONTROL OF EXECUTORS, ADMINISTRATORS, GUARDIANS, AND MINORS UNDER SUCH REGULATION AS MAY BE PRESCRIBED BY LAW. Of course, this has to do with civil matters. The "Interpretative Commentary" immediately following this Constitutional Amendment is

very instructive. The cases cited thereunder are extremely positive.

Article 1994, Vernon's Annotated Texas Civil Statutes, provides for a suit and representation by a next friend for minors, lunatics, idiots and persons non compos mentis. The historical note thereunder is very enlightening. If a "class action" can be brought by or against a group of minors, a "class action" can likewise be brought by lunatics, idiots, and persons non compos mentis. If such "class actions" are permitted by minors and our courts should follow the "Rule of Stare Decisis," our country would be without any jurisdictional system whatever for our legal protection. The cases cited under this Article are positive, interesting and most informative.

There are cases that hold that a Judgment in an action by the next friend of a minor may be set aside as being void for several reasons. In actions against a minor, or minors, many judgments are void for several reasons. 43 C.J.S. Infants § 122, p. 339.

"Class Actions" were first brought in federal courts under the rules of equity. 30-A C.J.S. Equity Chapter "H. Rules in Federal Court." § 164 on page 155, states how class or representative suits, where one or more parties are permitted to sue or defend for all members of the class, were expressly authorized when the question was one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court. Under Rule 23, Federal Rules of Civil Procedure, such suits are classified as "Class Actions." Of course, objections for misjoinder or nonjoinder of parties might be made by Motion or Answer. The Federal District Court still has the power to appoint guardians ad litem, and he must see that justice is done in the minor's behalf. 30-A C.J.S. Equity § 355, p. 375.

"Class Actions" in Texas have long been recognized by Courts in equity between adult persons. There is nothing said about

any "class actions" by or against minors. 22 Tex.Jur.2d 563, Sec. 21; and 32 Tex. Jur.2d 568, Sec. 26.

All fifty states may enact statutes that will grant special privileges under the equal protection clause of the 14th Amendment of the Federal Constitution, and Federal Rule 23, Federal Rules of Civil Procedure, which permits "Class Actions" by or against adults. 82 C.J.S. Statutes § 159, p. 266. No Constitutional Amendment, Statute or Rules of Civil Procedure can be enacted but what it will work to the detriment of one or more individuals. The General rule of construction that all statutes in pari materia are to be construed together, but that statutes not in pari materia need not be construed together has been applied by numerous particular statutes. 82 C.J.S. Statutes § 366 C, p. 814.

This section points out that when it is necessary to ascertain the meaning of an ambiguous provision of a statute, the Court may consider other related statutes in connection with the construction of statutes concerning descent and distribution, divorce, dower, homestead, education, and, likewise, in connection with construction of statutes concerning elections. In the construction of statutes relating to infants, see 82 C.J.S. Statutes § 366–C, Note 29, p. 820.

There is only one way that a suit can be brought in behalf of a minor, or minors, lunatics, idiots, or non compos mentis persons, and that is by a legal guardian or a next friend. The only way a suit can be brought against a minor, or minors, lunatics, idiots, or non compos mentis persons, is to bring an action against them, serve them with a citation, make a motion to the District Court to require the District Judge to appoint a guardian ad litem (which the District Judge must do) before any Judgment can be taken against the minor, or other persons. Any Judgment taken against a minor or other person without this process and positive proof against the minor, or other person, is void.

Much has been written about "Due Process of Law" in the last few years. Charles Allen Wright wrote an Article in Vanderbilt Law Review, Vol. 22, beginning at page 1027, on the question of "The Constitution on the Campus." This article is interesting indeed. He does not mention any cases that were ever brought by minor plaintiffs or minor defendants either singly or as a "class action."

42 Amer.Jur.2d, beginning on Page 1, and ending on Page 199, regarding "infants" is most interesting indeed.

Article 295a, VATPC, which defines disruptive activities on campus or on property of educational institutions, does not give any minor a lawful right to violate the law or to do anything that will interfere with the rights of others. Apparently, we are going through a "generation gap," wherein less than one per cent of the minors think that riots, demonstrations, disruptive activities, cursing, using profane language, fights, destroying private property, destroying public property paid for by the taxpayers, rebellion, disturbing the peace, smut, pot, drugs, dope, hate, crime, whiskey, beer, sex, rape, murder, obscene pictures, long hair, large sideburns, whiskers, mustaches, hippies and hot-pants are a part of their way of life, regardless of what other American minors and adults think of such thoughts and activities.

Then, television, radio, and the newspapers always give this group of minors outstanding and special publicity as if this minor group of students represented the majority of all the citizens of America. To me, that is the worst thing that is happening to the American school system today. The teaching of moral principles and obedience always begins in the home. I have always thought that the public school was nothing more than a second home where such teachings were to be carried out. I still think so, regardless of what the many appellate courts say about "due process of law."

I think the churches are another place where the moral thinking and principles of obedience are taught.

Every spring I receive many invitations from seniors who have graduated from high school. I always write them a letter and tell them that their future depends upon their "adherence to the Teachings of the Gospel." I further tell them that: "They cannot find a peace of mind except from a God-Governed Conscience." I have a lot of faith in the majority of the youth of today in our country. I recently wrote a letter to a teenage girl in college in which I expressed my hope for the future, that the youth of today would rule our country tomorrow. In her reply, she said: "It is nice to know that there are still those in your generation who have not lost faith in my generation. Your letter is very thought provoking, and I appreciate your thoughts." (Emily Russell, Southern Methodist University, Dallas, Texas).

We are definitely getting away from the old principle of "Spare the rod and spoil the child."

I know a retired schoolteacher who has always lived in Upshur County, Texas. He has always been looked up to by everyone who knew him as an outstanding schoolteacher, excellent in every way. He always did an excellent job in the business world. He is now working for a bank in Gilmer, Texas. His name is D. T. Loyd. Since he quit teaching school, he wrote a History of Upshur County. He now writes a little history which is published in the weekly newspaper each week. Recently, he wrote a little history about school teaching. It reads as follows:

"EARLY DAY TEACHING—Soon after the beginning of this century the trustees in a rural school not far from Gilmer employed a young teacher for their school. There were about 15 boys who were mischievous rather than just mean, attending this school, so that along about Christmas the teacher could not stand it any longer and resigned. The boys in this school had a reputation of 'running the teacher off' so the school board talked to a man about 6 feet tall and weighed about 175 pounds and told

him the situation, so he took the job. This new teacher came to school the first morning and announced that all of the students might not be there until the end of school, but he would, and in his coat pocket he had a razor strap with both ends sticking out. A few of the boys dropped out of school, but the teacher remained there to the end and never did have to use the razor strap."

I have every confidence in this man. He could do a much better job in teaching the moral principles of life to a minor than any judge who ever wrote on the subject of "due process of law."

Now, the Texas Legislature has enacted an "Educational Code" in which they included "Sub-Chapter 1. Discipline, Law, and Order." It seems that they took all of the authority away from teachers to discipline children and left it up to the Board of Trustees. They even put it in the Statutes that the Board of Trustees could call upon the Governor for help in times of riots and in order to maintain law, peace and obedience of any and all moral principles. It says that the Governor may use the Department of Public Safety, but he cannot call upon the Texas National Guard nor any other military force to control the operations of the schools. It also gives the Attorney General the right to assist the Public School Board of Trustees should the Constitutionality of this Act be challenged in the Federal Court. Still, it doesn't authorize a "class action" by or against any minors in a civil suit.

Marwin B. Brakebill wrote an article on "Suspension of Students Pending Disciplinary Actions" in the Texas Tech Law Review, Vol. 2, beginning on Page 271 and ending on Page 279. He concluded this article with the following two paragraphs:

"In the long rugged road from the concept of in loco parentis (in the place of a parent) to the Dixon recognition of a student's constitutionally-protected 'interest' in acquiring an education, much stress has been placed on the procedural

aspects of university disciplinary proceedings. In balancing the respective, and, at times competing interest of the university and the student, not only legal but sociological factors begin to emerge to cloud the traditional relationships involved.

"In its simplest terms, a university cannot function without authority or survive amidst chaos. To fulfill its role as an educational institution, discipline is a necessity. On the other hand, a student cannot be relegated to the status of a mere number or be subjected to the whims of an administrative official. Dixon has set forth a basic accomodation of these interests in the disciplinary area by extending procedural due process, in a watered-down form, to university disciplinary proceeding. The boundaries of that extension are ill-defined. Beyond the requirement of notice and some opportunity for a hearing, uncertainty abounds. Mere technical adherence to these two requirements will not fully protect a student's interest in situations where he may be suspended before being heard on a charge of misconduct. In the absence of extreme circumstances, a student should be entitled to the status quo until his side has been effectively presented and fairly heard."

Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Circuit), Cert. Denied, 368 U.S. 930 [82 S.Ct. 368, 7 L. Ed.2d 193] (1961).

I do not believe that a careful examination of the cases cited in the original opinion and the concurring opinion actually say anything about a "class action" being brought in behalf of a number of minor students or against a number of minor students as a "class action." I urge a careful study of the cases and the law. It seems the minors are represented by a next friend, guardian, or guardian ad litem. If they were not so represented, the judgments and opinions are at least voidable, if not absolutely void.

In this case, there were extreme circumstances. One or more of the students had threatened to kill one of the teachers. It was one of the worst outbreaks of violence that ever occurred on a high school ground or in a high school building. Then, the teachers and the Board of Trustees gave to the students more than they deserved in two Administrative Hearings.

We do not have any Teachers or Board of Trustees living today, except a very few indeed, who would do anything evil or unjust to minor children. If I were a schoolteacher, or a Member of a Board of Trustees, and were forced to write bylaws, rules and regulations for any school, I would try to express the thoughts that are set forth hereinabove. I would make it very plain that any student who misbehaved in any way would be expelled from school. If it were a minor offense, he would be expelled for five days. If he were guilty of a second offense he would be expelled for the rest of the term. If he were guilty of violating the criminal laws, I would try to take appropriate action against the student in the criminal court. And, if the offense were of such a grade as those that were incurred in this case, I would expel them for the rest of the term.

A minor has no outright opportunities unless they are granted to him by the Federal Constitution, Federal Statutes, or Federal Rules of Civil Procedure; or by a State Constitution, State Statutes, or State Rules of Civil Procedure. No such rights occur in this lawsuit.

Very recently, the Congress of the United States enacted a Constitutional amendment that would give minors 18 years of age or above the right to vote. Texas has just recently adopted such a Constitutional Amendment. This right does not give the minors any rights to sit on juries, make any contracts that are enforceable, or do anything else. The only right that they acquire was the right to vote.

Under Texas law, a minor who has reached the age of 18 years may have his

disabilities of minority removed. Article 5921, VATCS. Also, under a Texas Statute, the parents of minors who do any malicious or willful damages to any property or destroy the same, the parents are civilly liable therefor. Article 5923-1 VATCS.

Under the Texas Statutes a boy who is under 19 years of age and a girl who is under 18 years of age can not get married without the written consent of a parent or their legal guardian. Sec. 1.52 V.T.C.A., Vernon's Annotated Texas Family Code. Otherwise, they must have the written consent of a parent or guardian.

At the time the riot started, there were approximately 6,700 students attending the Texarkana Independent School District. Of this number, there were about 1,650 students attending the high school. Yet, at most, there were only about 212 (such a small minority) who caused all the trouble. As I see it, many of these minors violated the criminal laws of the State of Texas, and were subject to prosecution. Yet, the teachers and the Board of Trustees, in a desperate effort to try to get along, took no criminal action against either of them.

This Court is bound by the record as it is presented for review. The record clearly shows that the minor students who were expelled from school for the rest of the semester had a right to immediately appeal to the State Board of Public Education to have their cases reviewed. This is a requirement, and they must receive an adverse ruling there before they could enter the District Court. Then, it would have to be brought by or on behalf of each minor; not as a "class action." Such is true when a minor student applies for a transfer from one school district to another. They must appeal to the State Board of Education. I personally know of one such case, and the State Board of Education ruled in favor of the students. This rule also applies to a schoolteacher in the event one or more of them are expelled or fired. They must first appeal to the State Board of Education. If the State Board of Education should rule against either of them, then

they may enter the District Court and try to convince the Court that the teacher, or teachers, are in the right. This has to be done before they can plead mistreatment because of lack of "due process of law." The same rule of procedure applies to City Firemen and City Policemen. If one or more of them are expelled or fired, they must immediately file an appeal with the Civil Service Commission. If the Civil Service Commission should rule against one or more of them, then they have a right to enter the District Court to try to allege and prove that they have been unlawfully expelled or fired.

Bearing in mind that not any of the parents, nor the minors, appealed their suspension to the State Board of Education after the administrative hearings, which the parents were required to do, Plaintiffs and "class plaintiffs" prayed for relief as set out in their original Complaint as follows:

"WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that upon the filing of this Complaint with this Court that the following equitable relief *for the aforementioned reasons* be granted:

"(a) That without notice and hearing the Court issue a temporary restraining order immediately restraining and enjoining the School Board of Texarkana Independent School District, and other defendants, or any of the agents or employees of the Texarkana Independent School District from interfering with or refusing to permit class attendance by *plaintiffs and all others similarly situated*;

"(b) That the Defendants be temporarily and permanently enjoined from preventing plaintiffs and class plaintiffs from attending Texarkana, Texas High School, unless and until Defendant School Board *complies with all of the requirements for a proper hearing in accordance with administrative due process.*

"(c) That the rules adopted by the Defendant School Board as *pertaining to*

*suspensions be temporarily and permanently enjoined* from enforcement by defendant on the grounds that such rules are overly broad and vague, denies constitutionally protected rights of free speech and freedom of assembly, and is discriminatorily and improperly applied.

"(d) That the Defendants be temporarily and permanently enjoined and restrained from withholding from *Plaintiffs or class plaintiffs* any of the rights and privileges of a student at Texarkana, Texas High School, including but not limited to the right and privilege of attending class and full participation in all school activities.

"(e) *That Plaintiffs and class plaintiffs* be afforded such other and further relief as this Court may deem proper." (Emp. added)

Therefore, as I view the record, the District Court did not acquire jurisdiction to grant the temporary restraining order; and, definitely no power to grant the permanent injunction. I think a fundamental error is clearly shown.

I would set the judgment of the District Court aside and dismiss the case for want of jurisdiction.